```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF OREGON

 3   UNITED STATES OF AMERICA,      )
                                    )
 4             Plaintiff,           )  No. 3:12-cr-659-MO-1
                                    )
 5        v.                        )
                                    )
 6   REAZ QADIR KHAN,               )  June 10, 2014
                                    )
 7             Defendant.           )  Portland, Oregon
     _____)

 8

 9

10

11

12

13                        Oral Argument

14                  TRANSCRIPT OF PROCEEDINGS

15          BEFORE THE HONORABLE MICHAEL W. MOSMAN

16            UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25
```

1

2                          APPEARANCES

3

4    FOR THE PLAINTIFF:      Mr. Ethan D. Knight
                             Mr. Charles F. Gorder, Jr.
5                            United States Attorney's Office
                             1000 S.W. Third Avenue, Suite 600
6                            Portland, OR 97204

7

8

9    FOR THE DEFENDANT:      Ms. Amy M. Baggio
                             Baggio Law
10                           621 S.W. Morrison, Suite 1025
                             Portland, OR 97205

11

12                          Mr. John S. Ransom
                             Ransom Blackman, LLP
13                           1001 S.W. Fifth Avenue, Suite 1400
                             Portland, OR 97204

14

15

16   COURT REPORTER:         Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
17                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
18                           (503) 326-8188

19

20

21

22

23

24

25

```
 1                    (P R O C E E D I N G S)
 2          THE COURT:  Go ahead.
 3          MR. KNIGHT:  Good afternoon, Your Honor.  We're
 4  present in the matter of the United States v. Reaz Khan.
 5  This is Case No. 12-cr-00659.  Ethan Knight and Charles
 6  Gorder, appearing on behalf of the Government.  Mr. Khan is
 7  present, out of custody, with counsel Amy Baggio and Jack
 8  Ransom.
 9          We're here today, Your Honor, on four defense
10  motions.  Preliminarily, I'll let the Court know I will be
11  addressing any questions or argument related to defendant's
12  motion to disclose taint procedures and protocols, as well
13  as defendant's motion relating to release of the hard drive.
14  Mr. Gordon will be addressing the other two motions.
15          THE COURT:  Thank you.
16          MS. BAGGIO:  Good afternoon, Judge Mosman.
17          Your Honor, as mentioned by Mr. Knight, the Court
18  has three motions scheduled for argument today:  the motion
19  for disclosure, which is court reference 64; the motion for
20  defense counsel access, court record 68; and a motion for
21  preservation of evidence, which is court record 67.
22          In addition, my co-counsel filed a motion for
23  release of evidence that appears in the record as court
24  record 85.  And with the Court's permission, we would like
25  to address that here today as well.
```

1    THE COURT:  That's fine.

2    MS. BAGGIO:  Thank you, Your Honor.

3    THE COURT:  Give me just a moment here.

4    (There is a pause in the proceedings.)

5    THE COURT:  I'm just going to have that printed.

6  Go ahead.

7    MS. BAGGIO:  Thank you, Your Honor.

8    As to the motion to preserve evidence, I don't

9  have anything to argue to our -- in addition to our paper

10  submissions, other than I wanted to update the Court

11  regarding the case of *Jewel v. NSA* that was cited in our

12  motion at page 3.

13    And just to update the Court, in the past few days

14  it has come out in the media reports that despite the

15  Court's order of preservation in that case, there was a

16  continuation of destruction of evidence.  And I mention that

17  only because I think that that further illustrates the need

18  for this Court's intervention as to defendant's request for

19  preservation of evidence.

20    But other than that, I didn't have anything else

21  to add, unless the Court has questions.

22    THE COURT:  Let's start with that.  I'm sorry,

23  I've forgotten which of you is arguing preservation.

24    MR. GORDER:  I'm the designated hitter on that,

25  one, Your Honor.

THE COURT:  All right.  The core of your position
is that the request is overbroad.  Is there then an
agreed-upon body of evidence that might normally be subject
to destruction of some kind but which you acknowledge would
be suitable for preservation as a sort of a criminal
litigation hold in this particular case?

MR. GORDER:  Your Honor, that's a difficult
question, I think, to answer in a logical way.  This is a
criminal case that was investigated by the FBI.  And in
connection with that, there was surveillance done through
the Foreign Intelligence Surveillance Act by the FBI.  A lot
of the details of that obviously are classified, but
including the minimization and retention instructions that
come from the Attorney General and the Foreign Intelligence
Surveillance Court.

I am confident -- we are confident in our
discussions with the FBI that the materials that the FBI
gathered during the course of this investigation will not be
destroyed, just like in any other criminal case really.  I
mean --

THE COURT:  When you say materials gathered,
you're not limiting it to those materials that the
prosecution team or others think is relevant for trial;
you're saying all materials gathered pursuant to the
principal investigation here by the FBI on this subject --

1          MR. GORDER:  Yes.

2          THE COURT:  -- are going to be retained and not

3     subject to otherwise standard destruction?

4          MR. GORDER:  I'm confident that in this particular

5     case, under the facts that we have -- some of which are

6     classified -- that that is true.

7          Now, I am not saying that about other agencies of

8     the Government, particularly in the intelligence community

9     or the Department of State or wherever that might have a

10    piece of paper with the defendant's name on it or some kind

11    of a data point with his telephone number or name or

12    whatever.  With what we have gathered with the FBI in this

13    particular case, we're confident that under the rules that

14    we're operating under, we can comply with *Brady* and Rule 16

15    and the other rules of discovery.

16         THE COURT:  I see the defense motion as what might

17    be thought of as requesting three circles of information.

18    One you've just described, the core information, all of it,

19    acquired in the FBI investigation through FISA procedures,

20    or otherwise, of this target, Mr. Khan here in this case.

21         The second is other agencies' efforts, at least as

22    contemplated by the defense pleadings in this case, as

23    supposed predicate groundwork for this investigation that

24    led to this FBI investigation.  They would also seek

25    retention of that material, and they have specifically

written about the possibility of CIA or NSA investigations
that led to this investigation.

And the third is what you just referenced, which
is everything else; that is, is there anything else anywhere
by any agency doing anything at all that has Mr. Khan's name
on it.

What about the second set of materials I just
discussed?  We've talked about the first one.  How about the
second one?

MR. GORDER:  With regard to the second one, Your
Honor, we have done our due diligence as best we can to seek
out what we felt were the relevant other agencies and made
particularized requests to them of information relevant to
this case.

Now, the identity of those agencies are
classified.  The results that we got back from them, if any,
are classified, but we have done our best to identify what
we thought was anything that would be discoverable in this
criminal case, and I've taken steps to either deal with it
in some way, either get it declassified or otherwise make,
you know, a considered judgment about it.

THE COURT:  What concerns me about your written
response to this portion of the defense motions was it
seemed to make the argument that it was sort of FBI or
nothing; if it wasn't the FBI, then you were under no

1    obligation to retain it.

2            I'm not sure that's the answer you've just given

3    me.  The answer you've just given me seems to suggest that

4    you've tried to draw the circle to include if there are any

5    other agencies' investigative materials that could be viewed

6    as part of the chain of investigation that led to this

7    indictment, whether it's the FBI or not.

8            So I sort of suggested that you have given me a

9    different answer than what you have in your pleadings.  Am I

10   wrong about that, or if I'm right, which is the better

11   answer?

12           MR. GORDER:  Maybe I'm not being clear, Your

13   Honor.  We believe that our discovery obligation lies

14   primarily with the FBI as the investigative agency in this

15   case.  We have made some inquiries to other agencies who are

16   not necessarily part of the investigative team in the case.

17   What we found, if anything, in those inquiries that we

18   thought was discoverable obviously will be retained as part

19   of the criminal case, but I don't want to say that, you

20   know, any particular intelligence agency either did

21   something that led to this investigation or otherwise.  I

22   mean, it wasn't just did they lead to this investigation; it

23   was whether they had any relevant discoverable evidence,

24   whether it came before the investigation, during the

25   investigation, or afterwards.

1          THE COURT:  Thank you.

2          Do you wish to be heard further?

3          MS. BAGGIO:  Your Honor, I don't think I do.  I

4   think our position was set forth in the papers.

5          THE COURT:  All right.  Well, I'm going to issue

6   my ruling in terms of these sort of three groups of

7   materials that I just discussed.  And the Government has

8   said that it is confident that materials from the FBI

9   investigation of this particular case leading to this

10  indictment and these charges will be retained and not

11  otherwise destroyed according to what at least some

12  declassified opinions or non-FISC opinions -- I'm thinking

13  of California, for example -- have described as document

14  retention protocols that result in periodic destruction of

15  documents or evidence.

16          That's the competition:  document retention for

17  litigation and subsequent appeal and normal -- I'm using the

18  word "document" broadly, I guess here, to include anything

19  that's retained -- document destruction according to

20  standard protocols, and in fact, as we've seen from some

21  declassified material, document destruction that can be

22  ordered by courts so that the failure to destroy becomes a

23  violation of court order.  That's the competition.

24          The Government has said that with regard to the

25  core body of evidence, which is the FBI's investigation of

this case through FISA or otherwise, those materials will be retained, not destroyed.  And I agree that that's necessary and appropriate here, and therefore I also order it.  In addition to the Government being confident of it, I order that they be retained.

I do so for a couple of reasons.  One is the typical reasons one might have in almost any case, FISA or otherwise, for the retention of potentially relevant materials that would otherwise be destroyed, and that is that it might become only clearer later in the litigation or even on appeal that something is important.

And the other, candidly, is that we are in a state of flux about what will be disclosed or not disclosed. Certainly Congress is debating amendments to FISA protocols and otherwise.  And I can appreciate how counsel in the position of the defense counsel here might want to preserve the pool of evidence even just for the possibility that down the line what was previously undiscoverable later becomes discoverable by statutory amendment.  So those are the reasons I'm ordering retention.

I think the same rationale applies to other investigative material that directly led to this investigation.  By "directly," I mean they involve the same events and are fairly thought of as the same chain of investigative efforts that led to this indictment.  So I do

not intend to include in that the third category of
materials I described, which is just anything any agency
ever acquired that mentions Mr. Khan.

And so to the degree I've been able to be precise,
I'm ordering retention of the first two bodies of material
but not the third.

I recognize that absolute precision is not
possible here, since we can't describe with precision the
sorts of materials we're talking about or even the agencies
that might possess them.  So let me just state that the
principle I'm operating on is that I'm ordering retention of
the sorts of things from which one might conceivably acquire
*Brady/Giglio* type of evidence or other evidence that might
get at defense motions that attack the evidence or the
charges in this case.

So *Brady/Giglio* is one issue, but there remains,
for example, issues of violations of statutory protections,
for example, that could result in motions.  So you mentioned
one of the things that you were confident would be retained
were any protocols in play for acquisition of evidence.  And
I agree with those also, not just interview reports or the
like, but those sorts of things -- because they could result
in acquisition of information that would lead to defense
motions that could successfully attack the charges -- also
need to be retained.

1    That's the first of your motions that you took up.

2  The next one?

3    MS. BAGGIO:  Thank you, Your Honor.  May I step to

4  the podium?

5    THE COURT:  Yes.

6    MS. BAGGIO:  Your Honor, as to the remaining two

7  motions that I'm addressing today, I prepared an argument

8  that addresses them together because I believe they are,

9  part and parcel, somewhat the same in a way.

10    Before I do address the argument, I wanted to

11  address a -- something I raised in the notice of a

12  supplemental exhibit filed on Friday, Footnote 1.  I stated

13  that although I previously stated there would be no need for

14  live witness testimony, we believe we might need to call the

15  case agent at today's hearing.

16    Upon further reflection and in consultation with

17  the prosecution team, we won't be asking to do that today,

18  Your Honor.  The defense will rely on the previously

19  submitted exhibits, the paper exhibits, in support of the

20  motion for disclosure and for attorney access.  So I wanted

21  to raise that first.

22    And second, as to the notice of the supplemental

23  exhibit that was filed on Friday, I refer to that as a

24  supplemental exhibit.  It may have been better cast as

25  Defendant's Exhibit I to the motion for disclosure, because

1    I had previously provided A through H, and this would have

2    been the next one in the series.  So either way, I just

3    wanted to make clear this would be a subsequent exhibit to

4    the exhibits previously filed along with the motion for

5    disclosure.

6              THE COURT:  Can I make sure that I have clear in

7    my mind what you're seeking by these two motions?

8              MS. BAGGIO:  Yes, sir.

9              THE COURT:  I understand the motion for disclosure

10   to be disclosure of basically minimization procedures and

11   taint team protocols used by the prosecution in this case.

12   Are you seeking more than that in the motion for disclosure?

13             MS. BAGGIO:  The second thing we're seeking, Your

14   Honor, is disclosure of the existence of additional

15   privileged communications that have been obtained.

16             THE COURT:  Right.  That's clear, I think, from

17   your pleading.  I didn't mention it.

18             And then the motion for access is -- also seems

19   fairly specific to me.  You want to have produced to you in

20   some form or be able to review any in-camera ex parte filing

21   in response to your motion for disclosure?

22             MS. BAGGIO:  That's correct, Your Honor.

23             THE COURT:  All right.  Go ahead.

24             MS. BAGGIO:  Thank you.

25             Your Honor, what I'd like to do is begin with the

areas in which I believe the parties agree.  And of course the Government can correct me if I get this wrong, but I believe we agree on four primary things.  First of all, the intrusion into a privileged communication can form the basis of either a motion to suppress that evidence or potentially a motion to dismiss the case.

Secondly, I believe there's an agreement that the January 2010 phone call that was recorded between Mr. Khan and Attorney No. 1 is a privileged communication.

Third, I believe there's also agreement that the January 2012 communications between the defendant and Attorney No. 2 also constitute privileged communications.

And fourth, I believe there's agreement that defense interviews of potential defense witnesses constitute privileged work product.

There are two things on which we don't agree, however, and I believe what we do not agree on is whether further disclosure is warranted of either the existence of additional privileged communications in the possession of the Government, somewhere within the Government; and secondly, the disclosure of the minimization procedures or filter team protocol that underlie past, present, or future monitoring, in that we are seeking disclosure of those procedures in order to assess further litigation.

First I'd like to address our request for

disclosure of the possession of additional privileged

communications.  Your Honor, the defense has already

established that the prosecution team is in possession of

and has accessed the content of privileged communications.

Now, the Government will neither confirm nor deny

the existence of additional privileged communications, but

states that any -- if I understand them correctly, any

privileged communications in its control or possession have

been disclosed to us.

What I think is important to note, Your Honor, is

that we see the potential of three different places where

these privileged communications may be.  Number one would be

privileged communications within the possession of the

prosecution team.  Full disclosure of those is necessary

because it is material to possible motions to suppress or

dismiss the indictment.

THE COURT:  Would that -- in your view, would

possession of that sort of privileged material be in

contravention of the statements made that they've produced

everything that they have?

MS. BAGGIO:  Yes.  But I believe, Your Honor --

THE COURT:  What I'm really asking is do you

believe there are ways for the prosecution team to possess

privileged material that somehow represents possession of

them without their earlier statement being false?

1       MS. BAGGIO:  No, Your Honor.  And I don't have a

2   reason to believe that there's been a false statement

3   either.  I want to make that clear.  I just want to -- I'm

4   trying to illustrate the three different places where I

5   believe that the privileged communications may exist.

6       THE COURT:  Right.  And I'm only asking the

7   question because I understand you to be suggesting that even

8   though the Government has made these assurances, that

9   doesn't preclude the possibility that there are privileged

10  communications being held elsewhere.

11      MS. BAGGIO:  Correct.

12      THE COURT:  Even if their representations to you

13  are true.

14      MS. BAGGIO:  Correct.

15      THE COURT:  So you're really saying two

16  things:  there are places these privileged materials can be

17  held even if what they've assured you is true; and then

18  there's the possibility that they, the prosecution team

19  itself, also has them.

20      MS. BAGGIO:  That's correct.

21      THE COURT:  What are the areas -- Let's go on to

22  the others, then.

23      MS. BAGGIO:  And as to the others, as I understand

24  it, the communications could be with the filter team; and if

25  the communications are with the filter team and have been

successfully walled off from the prosecution team, it's our
position that disclosure of the existence of those
communications is still warranted because if the
minimization procedures have been operating properly, those
communications wouldn't have arrived at the filter team
itself and would have been screened off before they arrived.

And then lastly, there would be the possibility of
additional communications that were obtained by some other
agency, recordings of a privileged nature that exist with
some other agency.  And I believe, Your Honor, that that
last type of communication gives us particular pause because
of the international nature of this case and the facts
underlying it.

I want to focus on for a moment of this threat of
future monitoring.  The defense exhibit --

THE COURT:  Let me ask first --

MS. BAGGIO:  Yes, sir.

THE COURT:  -- what happens with each of the three
others if in fact it turns out that it's true -- the first
one I think I know.  You've learned that the prosecution
team has privileged or work product communications -- let's
stick with privileged for a minute -- that they have them.
And I think you've already identified what you would do with
that.  You could either seek to suppress them and/or seek to
use it as a basis for a motion to dismiss.

1          What do you do if you learn that the taint team
2    has privileged communications?  And I guess, by definition,
3    you get suppression because that's what the taint team
4    de facto does, and you could get that de jure, I guess,
5    also.  But what else happens?
6          MS. BAGGIO:  Well, I think, Your Honor, the fact
7    of the existence of privileged communications that either
8    ended up directly in the hands of the prosecution team or
9    perhaps by virtue of the May 29, 2014 letter which described
10   at least the disclosure of content of the January 2012
11   communications establishes the fact that there's a problem
12   in the minimization procedure, and therefore this would give
13   basis to a motion to challenge the minimization procedures
14   as approved by the Court or as executed by employees of the
15   executive branch.
16         THE COURT:  And the third one, I'm not sure what
17   you're contemplating there.
18         MS. BAGGIO:  May I --
19         THE COURT:  Who is it that acquires privileged
20   communications that falls within your third example?
21         MS. BAGGIO:  If I may offer an example, Your
22   Honor.  For example, Ali Jaleel, who is an unindicted
23   co-conspirator in this case, is from the Maldives, his
24   family still lives in the Maldives.  As I understand the way
25   the Government has publicly explained its monitoring under

the FISA Amendments Act, Section 702, the Government

identifies valid foreign intelligence targets, and the

Government can then monitor communications from that target

or to that target.

And as discussed in the Privacy Committee

Oversight, PCL -- I'm sorry, Privacy Civil Liberties

Oversight Board, cited in our materials, March 19th of this

year, it seems that not only "to" communications and "from"

communications but also they capture "about" communications.

So let's assume for a moment that Ali Jaleel is a

valid foreign target.  If I communicate with an

individual -- perhaps a relative of his in the Maldives --

about Ali Jaleel under the Government's publicly explained

process of correctly identifying valid foreign targets, the

Government could obtain that communication from me, a U.S.

citizen, to a non-U.S. citizen.  They refer to the fact that

my communication has been obtained as an incidental

collection, but when that communication is going to convey

attorney -- I'm sorry, attorney work product, that's the

concern that we would have.

As described by the FISC review court in its 2002

decision, there is an encouragement of that information,

when helpful, to be shared from the intelligence side of the

Government with the law enforcement side of the Government.

And that gives rise to our concern.

1    I think that was also, as detailed in our papers,

2    discussed during the hearings on March 19th, that if it's

3    helpful and if it's evidence of a crime -- which, arguably,

4    if I put my prosecutor hat on, I may say that a

5    communication between counsel and a relative of unindicted

6    co-conspirator to discuss where the co-conspirator was or

7    wasn't in 2008 or 2009 would be evidence of a crime.

8    And that's why we're raising this.  I can tell you

9    from my perspective that threat has had a severely chilling

10   effect on the way we're undertaking our investigation.

11   THE COURT:  Go ahead.

12   MS. BAGGIO:  So the threat of future monitoring,

13   what we just discussed is really No. 2 on this list, the

14   communications with individuals abroad who may be subject --

15   subjects of monitoring under the FISA Amendments Act.

16   But also, we can go back to No. 1, communications

17   with --

18   THE COURT:  Can I ask just a clarifying question

19   then?

20   MS. BAGGIO:  Yes.

21   THE COURT:  Is your concern limited to future

22   monitoring that could result in privileged communications by

23   U.S. agencies?

24   MS. BAGGIO:  That's correct.

25   THE COURT:  So, for example, you're not raising

here in this motion whatever might be the case or might not
about the government of Pakistan engaging in its own
investigation of these events?

MS. BAGGIO:  That's correct.

THE COURT:  All right.

MS. BAGGIO:  So as to the first, communications
with local individuals currently being targeted by the
federal government, we have no qualms if the Government has
a valid monitoring order issued by the FISC to monitor an
individual's communications.  That is not our business and
I'm not raising -- standing on behalf of that person.  But
as evidenced in our exhibits, the problem arises when
potential defense witnesses are themselves the subjects of
separate targeting orders.

We have -- in our investigation we've interviewed
several people, many of whom have been interrogate --
questioned by federal law enforcement officers and some who
reported that they were even on the no-fly list for some
period of time.  This has given rise to concerns on our part
that we would be able to engage in investigation and
communications with them without those communications being
disclosed to the prosecution team.

And the last threat of future monitoring, Your
Honor, is the fact that --

THE COURT:  I just want to be clear on your

position, then.  I mean, I understand that you're concerned

that if there's another investigation and you communicate

with a subject of that investigation, that that conversation

between you or your investigator and, from your perspective,

witness -- but from someone else's perspective, target --

that that communication makes its way to the FISC

prosecution team.  I get that.

Are you also challenging just the acquisition of

such conversations if they never make it to this prosecution

team?

MS. BAGGIO:  No, sir.  And I think our evidence in

this case raises the possibility that it can happen, and so

we're asking for disclosure of whatever the process is that

is designed to prevent that dissemination of information to

this prosecution team.

THE COURT:  All right.  Thank you.

MS. BAGGIO:  And the last threat of future

monitoring relates to the fact that -- excuse me -- that

Mr. Khan is in regular contact with his defense team by

telephone and email.  And I think it's reasonable after one

is indicted for a crime like this, that maybe there is

continued monitoring as to his communications.

Again, apart from the questions of whether or not

that might be a just order, my concern here, Your Honor, is

the possibility that the monitoring would obtain our

privileged communications, and I'm asking for disclosure of
whatever the protocol or procedure is to prevent
dissemination of those communications.

        THE COURT:  Does your argument about privilege
include work product?

        MS. BAGGIO:  Yes.

        THE COURT:  Every time you said "privilege," you
mean both?

        MS. BAGGIO:  Yes, sir.

        So those are the types of communications that we
would like to know if they exist, if they're in the
possession of the Government, but we're also
seeking disclosure of the processes, both the minimization
procedures --

        THE COURT:  I don't mean to interrupt you.  I'm
sorry, but I just want to be clear.

        Your argument up to this point has actually asked
for two things:  One is disclosure of past collections of
privileged or work product communications in a variety of
possible silos.  But you're also seeking for me to do
something to guard against the possibility and to prevent
future -- at least disseminations if not collections, right?

        MS. BAGGIO:  That's correct, Your Honor.

        THE COURT:  You're not asking for disclosure of
that, you're asking for something that would prevent it from

happening?

MS. BAGGIO:  That's correct, Your Honor.

THE COURT:  What?

MS. BAGGIO:  Well, that's what we're asking for, disclosure of whatever minimization procedures or filter team protocols are being used to prevent the dissemination of privileged communications to the prosecution team.  So that leads to the second category of materials sought in this case.

Does that answer your question, Your Honor?

THE COURT:  Right.  If I understand it, you want to know what the current protocol is, and then -- really if we -- even without knowing what it is, we can imagine two scenarios, can't we?  One is that the protocol is entirely adequate, there's just been failures of the protocol; the second is that there have been acquisitions and disclosures because the protocol itself is inadequate.  Right?

MS. BAGGIO:  I agree, Your Honor.

THE COURT:  And so you want to know which it is.  And if the protocol is entirely adequate, what happens -- what has happened is that there have been failures to follow the protocol, then what happens going forward with that scenario?  You just request better training or what do you do?

MS. BAGGIO:  Well, I would suggest that if the

1    problem is in the execution, then we need additional

2    procedures.  Then there's been a breakdown in the system

3    somewhere.

4            THE COURT:  Well, that's an answer only a lawyer

5    could love:  The procedures are adequate, they have failed,

6    but we need more procedures.  There's got to be a better

7    answer than that, doesn't there?  So the procedures are

8    adequate but there's been human failure.  What is it that

9    you think the defense would want to do about that?

10           MS. BAGGIO:  Well, I think if you look at the four

11   corners of the procedure, it might only come to light what

12   the problems are.  It might refine until you look at the way

13   it's been executed, and then maybe the vagueness of a term

14   or the lack of an independent review would come to light;

15   and then, in effect, it is the execution that would give

16   light to what the actual problems within the four corners

17   are.

18           THE COURT:  All right.

19           MS. BAGGIO:  So as to our request for the

20   disclosure of those minimization and filter team procedures,

21   I start with our position that the minimization procedures

22   and filter team protocol are not work product, and the FISA

23   minimization procedures are obviously an essential and

24   important part of first the FISC's review of an application

25   by the Government, as well as this Court's review of an

1    application and orders in a particular criminal case.  It's

2    thought of and it is contemplated by the statute itself and

3    we believe that those are not privileged work product.

4               As to the filter team -- Yes, sir?

5               THE COURT:  I'm not sure I understand why not.

6    You said that they're not work product because they're

7    required by the courts?

8               MS. BAGGIO:  Because they are part of the request

9    that's submitted by the Government, and the Court reviews

10   them initially, as the FISA statute itself talks about what

11   the minimization procedures --

12              THE COURT:  That's what I'm asking.  Is it because

13   they're disclosed to the Court by third parties that they

14   cannot be work product?  Is that your argument?

15              MS. BAGGIO:  No, sir.  I would say that's step

16   one, that it's part of establishing the lawfulness of the

17   process.  And when there's a problem with the minimization

18   procedures as contemplated within FISA, a motion to suppress

19   may lie if the minimization procedures were not followed or

20   if they're flawed themselves.  And therefore, it's our

21   position that that means they're not work product because

22   they can't -- the failure to follow them would be a basis to

23   suppress the evidence.

24              THE COURT:  All right.

25              MS. BAGGIO:  And then the filter team protocol,

it's our position that, as evidenced in other cases, the
Court can provide very valuable input into the propriety and
execution of filter teams, and that -- that as evidenced in
our papers and multiple -- and more than once the Court has
ordered a change in a filter team protocol proposed by the
Government in order to make it lawful.

And we would rely on that as evidence for why the
filter team protocols are not generally work product, but I
think even more so here, Your Honor, we're not just doing a
run-of-the-mill we want this information.  We have the
record in this case that proves that the protocol and
minimization procedures are both material and relevant and
necessarily -- and require disclosure because of the process
in this case.

And I would rely first on the evidence related to
the January 2010 phone call.  I got this -- these facts from
the Government's response at 3.  And what we have here is
the order of events, as best as I could discern them, that
No. 1, the defendant is turned away from a flight at
Portland International Airport on January 20th of 2010.  The
following day he makes an eight-minute phone call to his
attorney to discuss this situation.  There is an initial
seizure of that communication, by whom I don't know.  It
apparently -- again, as I understand the FISA seizure
process, there is no minimization at the time of seizure.

1    That seizure instead happens at the initial review, which I

2    have labeled as step 5.  Who conducts that, I don't know,

3    but what we do know is that that phone call between Mr. Khan

4    and his attorney was not minimized.  It was flagged as

5    potentially privileged but we know not by whom.  Was it by

6    the case agent?  If so, I say good for him, I'm glad that he

7    identified it as such, but on a process level, I submit that

8    it shouldn't be the case agent who would be reviewing the

9    information for potential privilege.

10        The Government's response then says that it was

11   sent to someone outside the prosecution team, who then

12   deemed it not to be privileged.  The communication was sent

13   to the prosecution team itself and the prosecution team

14   finds that it is privileged.  The prosecution team then

15   keeps the call and turns it over eventually to the defense

16   in discovery.

17        Your Honor, I think that this -- this sequence of

18   events establishes flaws in both the minimization procedures

19   and the filter team protocol.

20        The second communication that we have as evidence

21   of both the flawed minimization and filter team protocol

22   relates to the January 2012 communication.  Here we know

23   there's a January 2012 communication, that it's seized, that

24   it's not initially minimized, but upon review -- in this

25   case, as I understand it, it wasn't minimized and it was not

1    identified as potentially privileged, and some amount of the

2    contents was relayed to the case agent.

3         The communications were later deemed potentially

4    privileged, but I know not by whom.  Perhaps it was the case

5    agent.  And if so, again, I say thank you for that, but

6    that's not the place where it should have happened.

7         The communication is then sent to the filter

8    team -- we don't know when -- and the filter team reviews

9    it, deems it privileged and keeps the call.  Again, the

10   filter AUSA turns the communications over to the defense

11   over two years later.

12        So our position is this is another example of the

13   facts on which the Court can find that the minimization

14   procedures and filter team protocol in this case are flawed.

15        This establishes, Judge Mosman, that these

16   materials are material to the defense.  Just as the

17   existence of privileged communications in the hands of the

18   Government are relevant and material to what we are doing on

19   behalf of Mr. Khan, so too are the mechanisms by which those

20   communications were seized by the Government.

21        The Government took the position in its response

22   that we can just move to suppress the call, but I submit,

23   Your Honor, that in order to adequately litigate the past

24   seizures and prejudice resulting therefrom, we need to know

25   the full process.

1          And moreover, as discussed earlier, because

2    there's a threat of future dissemination of communications,

3    just allowing suppression of the past seizures doesn't

4    address the threat of future seizures, and that's why

5    disclosure is warranted.

6          THE COURT:  Let's walk through that for just a

7    minute because I want to understand the, I think, two or

8    three arguments you're making on this point.

9          The Government's response really is -- let's

10   assume for a minute that looking backwards and going

11   forwards, what happens is every time privileged

12   communications are acquired, that they are also then

13   disclosed to you.  Let's just assume that happens then.

14         I think the Government's position is that if you

15   get that, if they give you every time they acquire

16   privileged communications, then you'll be able to do the two

17   main things you said you wanted to do with this stuff at the

18   outset:  either suppress it or, if you see a pattern of it,

19   use it as a motion to dismiss.

20         It seems you've suggested that maybe there is more

21   than that you'd like to be able to do with this material, or

22   at least more concerns than that are raised by the

23   acquisition itself.  Am I right about that?

24         MS. BAGGIO:  Yes, sir.

25         THE COURT:  So I hear you saying that in addition

1  to seeking to suppress specific communications or use them

2  as a basis to dismiss, the other concern that's being raised

3  that isn't solved by post hoc litigation is the chilling

4  effect that it will have on your preparations for trial.

5  That's one, right?

6          MS. BAGGIO:  That's correct.

7          THE COURT:  And if I understand correctly, the

8  second concern you raise is that in addition to suppression

9  and dismissal for -- dismissing the charges for the

10  acquisition of privileged communications, there's another

11  piece of litigation you'd like to engage in, and that's a

12  motion challenging the sufficiency of the minimization

13  procedures themselves?

14          MS. BAGGIO:  That's correct.

15          THE COURT:  And the resolution of that motion is

16  different minimization procedures?

17          MS. BAGGIO:  I'm sorry.  The resolution of that

18  motion --

19          THE COURT:  If you file a motion saying that the

20  minimization procedures that you learn about are inadequate,

21  then what's the best result for you out of that?  Better

22  minimization procedures or dismissal?

23          MS. BAGGIO:  Well, I think the FISA statute says,

24  Your Honor, that that would be a basis to move to suppress

25  both the evidence of the calls themselves and anything that

1 derived from that evidence.

2      THE COURT:  All right.  Am I missing anything

3 else?  So your answer to the Government's position is that

4 you want to do more than just suppress known acquisitions or

5 move to dismiss based on known acquisitions.  You want to

6 move forward without any concern that it's happening, and

7 you want to be able to litigate the sufficiency of the

8 procedure, not just the legality of the acquisitions?

9      MS. BAGGIO:  That's correct.

10      THE COURT:  Thank you.

11      MS. BAGGIO:  The other problem that has arisen for

12 me, Your Honor, is in the context of preparing this

13 argument, I believe there is now a real question about how

14 the executive branch views privilege, and that is beyond the

15 statutory question.  That's a question of constitutional

16 magnitude.  In reviewing the 2011 NSA FAA minimization

17 procedures, which I was reviewing in preparation for the

18 argument because we don't know which minimization procedures

19 were actually used, I took notice of Section 4, which is

20 defined as acquisition and processing attorney-client

21 communications.  This minimization procedure states that a

22 communication -- the communication is between a person --

23 I'm sorry.  "As soon as it becomes apparent that a

24 communication is between a person who is known to be under

25 criminal indictment in the United States and an attorney who

represents that individual in the matter under indictment,"
and then it goes on to say you cease monitoring.

Well, Your Honor, I submit that that definition
under Section 4 is much, much more narrow than the
definition of attorney-client privilege.  This to me reads
more like a traditional conservative definition of a right
to counsel under the Sixth Amendment.

And the Government may say, oh, but that's the
2011 NSA minimization procedures.  This is different.

But when I was reviewing their response, they
state at three different places in that response that
Mr. Khan was not under criminal indictment at the time the
information was collected, suggesting to me that the
Government may be embarking on the same mistake of law
regarding the definition of privilege.

Disclosure is needed to address a past mistake of
law resulting in seized privileged communications but also
to avoid future seizure of privileged communications.

When I'm trying to understand what a minimization
process should look at, I took a look at what we typically
see under Title III wiretaps.  I understand this isn't Title
III, but we have typically a seized communication that's
either clearly pertinent and non-privileged, "Bring the
drugs to my house tomorrow," and that communication is given
over to the prosecution team right away, or it's a

communication that's clearly non-pertinent, "Hi, Grandma, happy birthday," in which case the communication is either minimized and not recorded or destroyed later, or we have -- in the minimization procedures under Title III, they take into account the importance of the questions of privilege in communication, whether it's attorney-client, doctor-patient, husband-wife or clergy-communicant.  And it gives specific instructions as to how to handle those different types of privileged communications:  to turn it off if that's an attorney-client call, or at least minimize it absent some reason to be concerned that there's an exception to the privilege.

        Okay.  I understand that's Title III and we're dealing with a FISA minimization procedure, but the legislative history of FISA states that "The minimization procedures are vital safeguards because they regulate the acquisition, retention, and dissemination of information about U.S. persons."

        And the legislative history -- and this is at Senate Report 95-701.  "The minimization requirement of this paragraph is meant generally to parallel the minimization provision in existing law," and then it cites the wiretap minimization.

        I submit, Your Honor, this is a fair framework within which the Court and hopefully the defense will have

access to review the minimization procedures to gauge the constitutional sufficiency.

Coming back to my question, how does the Government review privilege -- I'm sorry, view privilege, when -- in looking at the way the Government may be defining it, and trying to understand both the minimization procedures from the NSA and the Government's response, I looked at the Kris and Wilson book on privilege, "National Security Investigations and Prosecutions."

And this paragraph stands out to me, Your Honor. It says in Section 28-6, "Privileges are generally considered evidentiary; that is, a privileged communication may not be introduced in a trial or other proceeding. Privileges are not based in the Constitution, however, and are generally not thought to prevent all uses of information contained in the privileged communication.  Moreover, the privilege applies only to the communication itself, not to the information in the communication or information derived from the communication."

This -- this definition would be consistent with the Government's response and the NSA minimization procedures.  And I submit, Your Honor, if that's what they're doing, this is a very big constitutional issue and requiring further disclosure of the underlying documents.

THE COURT:  I'm going to pause you there, just

1  because I think I have the gist of your argument and I need

2  to hear from the prosecution in the time that we have

3  remaining.

4          MS. BAGGIO:  Sure.

5          THE COURT:  You've raised enough issues for them

6  to spend some time on.

7          Mr. Knight.

8          MR. KNIGHT:  Thank you, Your Honor.

9          I think what I will do is break this down into a

10  discussion of the protocols and procedures as they relate to

11  managing privileged communications; and then secondly

12  discuss the arguments related to the existence of privileged

13  communications.

14          First, Your Honor, and at the outset, I should

15  note that the way the Government views this issue and the

16  way it framed it in its response is that when we're

17  discussing procedures and practices for dealing with

18  privileged information, we view there to be materials that

19  may be responsive to that request that are not related to

20  FISA, in the sense that they are procedures or practices

21  undertaken by prosecution team members in the course of the

22  investigation to manage that material, and then there are

23  materials specifically attendant to FISA minimization

24  procedures that may be subject to litigation under Section

25  1806(f) of FISA as other documents.

And we've broken those apart because the latter would require and likely cause the Government to assert a claim of privilege from the Attorney General over those documents and the disclosure of those documents.  I think that speaks to the desire to obtain specific FISA minimization instructions and procedures.  That's how the Government has approached these two issues.

THE COURT:  What's your position now on the first of those two?

MR. KNIGHT:  On the first of those two, Your Honor, is really twofold, and I think what should inform the Court's analysis of this question is an issue raised by the defense, and that is there is this underlying assumption that there is an ongoing acquisition or monitoring of privileged communication.  There is nothing in the discovery or in any of the pleadings, other than what I would frankly call speculation based on the fact this is a national security investigation, to suggest that's the case.

And that's important because if I'm understanding the argument, part of the reason the defense is seeking the minimization or filter protocols is to ensure that they are complied with effectively and efficiently going forward. And to the extent there is no ongoing acquisition of privileged material or evidence of it, the notion that the defense would need the filter protocols is made moot.

1    Now --

2    THE COURT:  Well, I want to be precise about what

3    I think you're saying.  If you're saying that the particular

4    authorized FISA targeting of Mr. Khan as a target, a subject

5    of a FISA investigation has ended and you're no longer using

6    FISA surveillance techniques to listen in on his

7    conversations, fair enough.  That doesn't quite answer at

8    least one of the concerns raised by the defense, which is

9    the idea that there's some other target of some other

10   investigation that would result in, say, Ms. Baggio's phone

11   calls to somebody in Pakistan or the Maldives being

12   acquired.

13       So wouldn't that be the case -- let's just start

14   there -- that your assurance that it's ended in this case

15   would not prevent at least the possibility of privileged

16   communications being acquired in some other investigation

17   but involving this defense team and this defendant?

18   MR. KNIGHT:  Well, at the outset, I should say

19   Mr. Khan received notice that he's an aggrieved party under

20   FISA, and we believe we will handle specifically legal

21   issues related to his status as an aggrieved party in that

22   part of litigation.

23       As to Ms. Baggio's concern that there may be

24   overlapping investigations that may capture her

25   communications, really two responses:  One, it's a

speculative argument, and I don't think it's any more likely
to be a concern in this case than many others.  And for
example, Your Honor, there are often scenarios or cases
where a defense attorney or investigator in a non-national
security setting will contact a third party or an
investigator will contact a third party and that information
finds its way back to a prosecution team.

So the spectrum of a national security case
doesn't present us per se with issues that require the Court
to order some different protocol or practice in this case.
I think that gets back to what they're seeking, which are
the protocols or procedures undertaken in this case.

Now, I can assure the Court --

THE COURT:  I just want to start there.  Your
answer then is, in part, in a non-national security case, a
non-FISA case, a -- let's take a Title III case.  The Title
III ends, everyone knows it's over with, but some
investigative team not in Oregon but in California is up on
a related drug organization; and in the course of
interviewing witnesses, your argument is that a defense
attorney here in Portland could end up talking to someone
who is a witness or involved in some other Title III in
California, and that conversation could have a number of
things happen to it, including acquisition by investigators
in California, right?

1           MR. KNIGHT:  Absolutely.

2           THE COURT:  And so if I understand your argument,

3    it's a risk that defense attorneys face all the time in FISA

4    or non-FISA cases, and the answer isn't review the protocol,

5    the answer is figure out what to do with those acquisitions.

6           MR. KNIGHT:  Well, that's correct.  And I don't

7    mean to belittle the concern of the defense, but it gets

8    back to the question of what is the Government legally

9    obligated to disclose.  And if the question is before the

10   Court should the Government disclose the filter team

11   protocols and practices employed in the non-FISA context in

12   this investigation, we believe that to be separate from a

13   scenario the Court has just identified that exists in most

14   post-indictment investigative -- defense investigative stage

15   cases, where there may be activities that are learned of by

16   third parties.

17          Now, the Government has submitted to the Court

18   ex parte and under seal, because it believes the material is

19   work product, as it has separately identified in its

20   response, steps it believes it has taken to address

21   reasonably foreseeable circumstances relating to work

22   product and privileged communications.  And to that extent,

23   what the Government believes is it has acted in a manner

24   that is responsible and careful.

25          But the notion that it may --

1          THE COURT:  I'm still trying to sort through this
2    T3 analogy here.  I guess part of what concerns me about it
3    is that if -- if this were a drug defendant and the concern
4    Ms. Baggio had was she's afraid to call anybody in
5    Sacramento for fear she may end up on a Sacramento wiretap,
6    that's sort of the analogy to her concern here.
7          I guess you're saying the answer is you might, but
8    isn't the answer to that sort of we know what the protocol
9    will be for T3s in Sacramento to prevent that from
10   happening?
11         MR. KNIGHT:  But I think two things, Your Honor:
12   One is that the nature of this argument -- and this
13   dovetails with discovery arguments as well -- is
14   speculative.  I mean, I understand the concern --
15         THE COURT:  Well, isn't it a little less
16   speculative in this case than it might be, since we have the
17   FPD investigator's work product, interviews of witnesses in
18   *Mohamud*?
19         MR. KNIGHT:  Well, but I don't think -- I think
20   that's a separate question.  That's work product which the
21   Government doesn't believe is necessarily privileged in that
22   context.  When an investigator talks to a third party,
23   that's different than attorney-client privileged
24   communications, which I hear to be a concern.
25         And I think to answer the Court's question, last

question, it is that the Government can represent to the Court that it is aware of this concern about overlapping investigations and has cautioned and discussed that if it were to arise or if those communications were to be heard about, to take appropriate steps and contact or direct that material away from the prosecution team.

But without knowing -- we're operating in a sort of speculative universe of what they're concerned may happen, and we don't have a specific manner or way to address something that's that attenuated.

THE COURT:  What's your response to the argument that the chronology of events in this case for the acquisitions here creates at least a reasonable inference of a flawed protocol?

MR. KNIGHT:  Well, the Government has conceded, I think, two things.  One, the chronology supports the Government's position as it relates to disclosure because many of the cases cited by the defense relate to Sixth Amendment and the post-indictment acquisition and management of privileged communications.  We're talking about material that is preindictment and relates to attorneys that do not currently represent defendant.

Now, as to the flawed protocol, the Government readily concedes --

THE COURT:  Well, let me just get back to that

point.  Are you saying -- what am I to make of that fact?
The defendant called an immigration lawyer and spoke and
that's okay?  That's not privileged --

       MR. KNIGHT:  No, not at all.

       THE COURT:  -- if it's preindictment?

       MR. KNIGHT:  Well, if the argument is in fact that
there is a due process violation -- and their motion raises
the specter of constitutional concerns with the acquisition
of that material.  The law is quite clear, I think, on the
fact that the preindictment communications may raise a
different issue about what violates a Sixth Amendment right
to counsel than acquisition or management of post-indictment
communications.

       THE COURT:  Well, were the acquisition of those
conversations or communications improper under the statute?

       MR. KNIGHT:  I'm not going to speak to the FISA
minimization procedures.  We believe those are properly
handled under 50 U.S.C. 1806(f) if a claim of privilege is
filed.

       I will say in response to the Court's question
about a flawed protocol that our position is that the
protocol itself was not flawed, in the sense that the
materials were identified as potentially privileged, but the
substantive determination was wrong.  I think it's without a
question that the communication identified and produced in

discovery was indeed a privileged communication, and it should have been, when it was identified by the filter protocol in place, it should have been kept separate from the prosecution team.

I think the question then becomes remedy and what steps going forward need to be taken.  And that is why the Government has undertaken to provide all of -- and this gets us, I think, into the second question and category raised by the defense, and that is the existence of privileged communications.

THE COURT:  Go ahead.

MR. KNIGHT:  The question then becomes what to do with this material and what remedy is available to defendant.

The existence of privileged communications, the Government has undertaken an effort to ensure now, because of the concerns raised, that defendant has all of the privileged communications acquired during the investigation.

Ms. Baggio raised three categories in her PowerPoint of privileged communications that may exist.  The first were ones in possession of the prosecution team, the second were those in possession of the filter team, and the third were privileged communications potentially possessed by others.  And I think that gets into the questions the Court posed to Mr. Gorder earlier about what other entities

1   may possess privileged material.

2           I'll speak to the first two categories because

3   they relate to the representations the Government has

4   already made to the Court.  The defense has been provided

5   with all privileged communications acquired in the

6   investigation of defendant possessed by the filter team or

7   that the prosecution team has seen.

8           The Government has also provided the degree of

9   exposure or taint of those materials.

10          THE COURT:  Meaning what?

11          MR. KNIGHT:  Meaning the Government has explained

12  and made available the case agent to explain who has seen

13  what on the prosecution team and to what degree they had

14  knowledge about the contents.

15          And I think the meaning of that is important

16  because it gives the defense, without any litigation on that

17  subject, an opportunity to make any argument they'd wish in

18  a motion to dismiss regarding a substantive due process

19  violation -- or a procedural due process violation.  So

20  that's been provided.

21          So speaking to those two categories, they have the

22  privileged communications.

23          Now, there's this third category.  They may want

24  other communication.  It's a confusing request because it

25  seems to me that if we're not aware of other communications,

it would -- I don't understand why then the defense would either want access to them -- the Government has a discovery obligation, and they certainly will get anything that is discoverable, but then why the Government should seek to acquire additional privileged communications from any other entity, it seems like an odd request as it relates to either remedy or discovery, and I'm not sure what to say to the Court when the question is raised that they want all communications in possession of other entities.

THE COURT:  So, I mean, if we just speculate for a minute not about the future but about the past, in the future what Ms. Baggio said was one of her concerns is that there would be a related or even unrelated investigation that would somehow cause her conversations with someone, you know, in the Middle East to be acquired, so -- and that could be by agencies unrelated to this investigation and prosecution.

If that has happened in the past, you're suggesting that the best course is, since you don't know anything about it, to just leave it alone, not learn about it, not acquire it as a prosecution team in order to disclose it, but just leave it alone?

MR. KNIGHT:  Well, first I want to say that the Government has made inquiries of other agencies about material related to this case.  So I -- the notion that

1  there may be lots of privileged material out there I think

2  is speculative at best.  The Government has provided the

3  material it has.

4      THE COURT:  That's always a -- I'm not sure that

5  argument is going to have as much weight as you want it to,

6  because defense counsel in its position can really only make

7  speculative arguments.  So you can't make them make

8  speculative arguments and then knock them down by saying

9  they're speculative.

10     MR. KNIGHT:  No, but the Government can say with

11  specificity what it has done to comply with its obligations.

12     THE COURT:  You have reached out as best you know

13  how to not just the FBI in this investigation but wherever

14  else you think that might likely be found to disclose

15  whatever you think is reasonably obtainable by you out

16  there?

17     MR. KNIGHT:  Absolutely.

18         And second of all, Your Honor, I don't think

19  there's any controlling legal authority nor do I think it's

20  really appropriate for the Government to affirmatively seek

21  out privileged communication that may be in the possession

22  of some entity.  I mean, that -- that's totally separate

23  than a discovery request, and that would seem to be creating

24  and inviting a situation where this defendant's due process

25  rights may get violated.

1          THE COURT:  All right.  So as to the past, you

2     believe you've disclosed everything that's out there that

3     could legitimately be obtained by you?

4          MR. KNIGHT:  Yes.

5          THE COURT:  And anything else that's out there, if

6     there is any such thing -- which you doubt -- you'd just as

7     soon never see it or touch it?

8          MR. KNIGHT:  As a member of the prosecution team,

9     I think it's my obligation to neither see it or touch it.

10    And I think --

11         THE COURT:  I'm just making sure that's your

12    position.

13         MR. KNIGHT:  Yes.

14         THE COURT:  It's possible, I suppose, that

15    something like that from the past is out there; and you

16    think the best remedy, if that ever did happen, since you

17    tried to acquire all of it, is to just leave it where it is?

18         MR. KNIGHT:  Yes.  But that's suggesting it's

19    there, but yes.  And I think --

20         THE COURT:  I'm not saying you'd know of

21    something, but that's your answer.  If you were to go out

22    and look and find more, you think that would be a mistake

23    compared to just leaving it alone?

24         MR. KNIGHT:  Yes, if it's not discoverable and

25    it's privileged.

And I think this speaks to the remedy question the Government raised in its response that I do not believe is thoroughly addressed in the reply, and that is what is the purpose of seeking this material from the Government?  Where does it get this defendant ultimately?

THE COURT:  Well, the past we understand.  The purpose is to suppress it or create a pattern of activity that could result in dismissal of the charges, right?

MR. KNIGHT:  But I think that can be accomplished with disclosure solely of the items that have been disclosed.

THE COURT:  All right.  Fair enough.

And then as to the future, I'm sort of recapturing in my own mind the argument you've made.  As to the future, your contention is that given your statement publicly on the record here that there are no ongoing acquisitions against this defendant -- is that what you said publicly?

MR. KNIGHT:  No, Your Honor.  As I said, this defendant has been given notice that he is an aggrieved party under FISA.  The Government will litigate questions of FISA separately.

However, there is no indication or evidence that this defendant -- or privileged communications have been obtained, other than those in the past.  The Government has not publicly said one way or the other that -- there's no

reason to believe that's happening.  It gets into one of

these scenarios where the Government is being told to prove

a negative, and we've told the defense repeatedly.

THE COURT:  I guess I'm not at all sure where that

leaves us.  Ms. Baggio said -- one of her worries is that in

representing client and in talking with other people that

her privileged communications could be acquired either by

unrelated investigations or by this investigation.  That's

what she said.

And your answer to the second one, this

investigation, is don't worry because why?

MR. KNIGHT:  Well, in part the Government has

addressed this in its classified pleading, we believe.

THE COURT:  I'm just trying to get your public

response.

MR. KNIGHT:  That just presuming that the

Government is monitoring on an ongoing basis

post-indictment, which I understand the argument is, there's

no basis for it.  I mean, there was an investigation in a

discrete period of time.  There was obviously

court-authorized --

THE COURT:  That's the same tautology we discussed

a minute ago:  There can't be a basis for it, all she can do

is wonder.

MR. KNIGHT:  I don't think so.  I mean --

THE COURT:  What would be the basis for her suggesting there's an ongoing investigation that she's worried about?

MR. KNIGHT:  What would be the basis?

THE COURT:  Yes.

MR. KNIGHT:  I don't think is there one.  That's precisely the Government's --

THE COURT:  I know you don't think there is one. I'm saying how could there be one.  What defense attorney could ever make a nonspeculative argument about this point?

If they're worried that they're being acquired and they don't have any reason to know one way or the other whether they're being acquired or not, so they raise the issue and say, please don't acquire my conversations with my client, then it seems a little tautological to say, well, I appreciate your point, but you've raised no reason that you have in your possession, defense attorney, for believing that it's happening.  They would never know one way or the other.

MR. KNIGHT:  Well, two points.  That's not necessarily the case.  I mean, I think the Government is hamstrung by the existence of classified information, the manner it's managed.

I think secondly, there is no precedent or suggestion that the Government in any criminal case on an

ongoing basis -- and getting back to the Court's Title III

analogy -- continues to monitor in some circuitous way

communications between an attorney and a defendant.

THE COURT:  All right.  So that's your answer as

to why the concern raised about future acquisition shouldn't

result in disclosure in this case.

And your answer to why -- the concern raised about

the potential for future acquisition in other cases, the

hypothetical Ms. Baggio gave us about either she or I

suppose her investigator calling someone in the Maldives

about this case, your answer to that, if I understand what

you've said publicly here on the record today is that what?

Help me with that.  Why shouldn't she be worried about the

possibility?

I think you've said that you reached out to try to

make sure that guarantees are in place that you, the team,

will never see that kind of thing.

MR. KNIGHT:  Well, it's twofold.  First, the

speculation is not an insignificant concern here, because

when we talk to law enforcement about what to look out for,

what to ensure is kept separate from prosecution team

members without any clear parameters about what to look for,

it is speculation.  But we have taken steps to say -- to

ensure that communications aren't directed, in any

reasonable way that we can foresee, to prosecution team

1    members.

2            The second issue is -- and this gets back to work

3    product, which is different, we believe, than

4    attorney-client communications, which are privileged in a

5    different way.  If Ms. Baggio or an investigator contacts a

6    third person, and that third party in turn contacts somebody

7    else and that information gets back to the Government, the

8    Government does not concede, as the initial PowerPoint

9    suggested, that that is somehow privileged material.  That's

10   an entirely different issue.  And that's the scenario, we

11   believe, when you remove the layer of national security off

12   of this case and look at any criminal investigation, it does

13   occur sometimes where an agent goes and talks to an

14   affiliated gang member, or a lawyer does, representing the

15   defense or investigator, and says, hey, tell us what

16   happened, and that conversation is overheard.  That

17   conversation is related to a third party.

18           THE COURT:  I understand your point.  If you -- if

19   a defense investigator talks to a co-conspirator in a drug

20   conspiracy and writes up a report for the defense attorney

21   in the case, and that same person decides to talk to an FBI

22   agent or DEA agents, then the work product isn't covering

23   the subsequent conversation between the co-conspirator and

24   the DEA agent, it covers just the initial work product of

25   the memo or other product from the first, right?  That's

1    your point?

2              MR. KNIGHT:  Yes.

3              THE COURT:  And that can happen in this case in

4    the same way.  At least that's your argument, right?

5              MR. KNIGHT:  Absolutely.

6              THE COURT:  And that, as far as I can tell, is not

7    just your argument about work product but it's also the

8    argument you're making about privilege?

9              MR. KNIGHT:  Well, I think --

10              THE COURT:  If Ms. Baggio calls a witness in the

11    Maldives, and that conversation is privileged but -- or

12    might be, but that witness can call whoever he or she wants,

13    right?

14              MR. KNIGHT:  Well, privileged -- we view the

15    attorney-client privilege a little differently than what

16    would be classified as a work product privilege.  And I

17    think obviously that's an area where she's calling somebody

18    in the Maldives, the factual analysis then depends on is

19    that communicated to a third party and what's the nature of

20    that initial call.

21              THE COURT:  So you'd have higher concerns about

22    anybody with the prosecution team having any conversation

23    with that witness about what he and Ms. Baggio discussed?

24              MR. KNIGHT:  Yes.  And then even I would say

25    higher concerns because of what the law is about the

acquisition or even awareness of contacts between attorneys and their clients, which is why the work product issue has been sort of conflated in the motions a little bit in its difference.

THE COURT:  All right.  Thank you.

Ms. Stephens, what time is the next hearing?

THE CLERK:  3:00.

(There is a pause in the proceedings.)

THE COURT:  Mr. Bailey, are you okay for a little bit?  You're getting paid, right?

MR. BAILEY:  I'm just coming to watch, Judge.

THE COURT:  All right.

Ms. Baggio, go ahead.

MS. BAGGIO:  Your Honor, just briefly, if I could address the last item covered first.

I agree.  There's a completely -- the work product about which I'm concerned are my direct communications with a potential witness.  If that witness decides to pick up the phone and call the FBI and tell them what we talked about, they can do that.  My concern is the surreptitious surveillance of those communications.

THE COURT:  The initial conversation?

MS. BAGGIO:  That's correct, Your Honor.

The concern I have with the Government saying if we ask, then that's going to -- about the existence of

additional communications, that's going to provide a
problem, we're inviting the dissemination of the privileged
communication, I think that would be sort of an ostrich
approach to a real problem.  And if I understand the way the
information sharing goes, without a proper prophylactic
order in effect that can prevent that information from
reaching the prosecution team, then it could be that it
would be transmitted as helpful evidence related to a crime.
So that's our concern, a prophylactic effect or an order
that would prevent that dissemination from happening.

But otherwise, Your Honor, I feel clear that you
understand our questions and concerns.

THE COURT:  All right.  Thank you.

One last matter, Mr. Knight or Mr. Gorder -- I'm
not sure who will take this up.  Do I understand CIPA
correctly that one possibility -- and I'm merely raising it
as a possibility at this point -- is for the United States
to produce a publicly available summary of evidence?

So in a trial, for example, where there was an
interview of a witness that was classified, one possibility
under CIPA is to produce a summary of the otherwise
classified interview material and see if that will fly for
trial, see if that is a usable alternative.

Is that possibility available for the protocols
themselves, which I think Ms. Baggio at least views as

1   evidence of a potential statutory violation?

2           MR. KNIGHT:  I -- walking through the steps of

3   CIPA, I think it's a possibility.  The first step would be

4   the Government would likely claim a privilege over the

5   classified material, and then I think we may get to the

6   point, depending on the Court's rulings, where a

7   substitution is deemed necessary.  I think that is indeed a

8   scenario that could play out under CIPA with this material.

9           THE COURT:  "Substitution" meaning that after a

10  series of intervening events, what would be contemplated

11  would be that the Government would attempt, at least, to

12  construct a nonclassified summary of its protocols and taint

13  team procedures?

14          MR. KNIGHT:  That's right, in order to comply with

15  the Court's order after reviewing the initial presentation

16  under CIPA.

17          THE COURT:  I'm sorry, tell me what that last part

18  means.

19          MR. KNIGHT:  The substitution would be designed to

20  comply with the Court's order, likely rejecting the

21  Government's claim hypothetically that it's privileged and

22  should be deleted from discovery under Section 4 of CIPA,

23  then the substitution would be fashioned.

24          THE COURT:  Thank you all.

25          I have a couple other matters, and in any event,

would like to think about this further rather than rule from

the bench.

Yes, sir?

MR. RANSOM:  Your Honor, we do have just one very

quick matter --

THE COURT:  Sure.

MR. RANSOM:  -- and that is will the Government

give us this burned disc so we can send it to an expert to

have him --

THE COURT:  I'm aware of the request.  Having just

looked at it, what's the Government's position on that?

MR. KNIGHT:  It's set out very clearly in the

emails that Mr. Ransom attached as exhibits.  We absolutely

understand that they have a right to inspect any material in

our possession.  What we've tried to do is facilitate an

initial step whereby the experts speak to one another, since

the evidence in question is what we believe to be an

intentionally burned and damaged hard drive that is

currently held as evidence.  The defense has not given us

the name of an individual to --

THE COURT:  What is it that you're suggesting we

do going forward?

MR. KNIGHT:  I would just like the experts to be

able to talk to find out what the best way to test this is,

do we need to have them come to the FBI lab to do the kind

of test they want to do?  Should the drive be taken to their expert's lab separately?

But the request right now is that we put it in an envelope and send it to an address, a P.O. box in California, without any other information, and I don't think that that either complies with the inspect requirement of 16(a)(1)(E) or would really be a responsible use of the Government's stewardship of this case.

THE COURT:  Are you willing to predate any actual testing by a conversation between the Government's expert and your expert?

MR. RANSOM:  No.  There's absolutely no reason for that.  They have a hard drive, it should be sent to our expert.  We've identified who the expert is.

I think if the Court later has an opportunity really to look at the communications between myself and Mr. Knight, you'll see what the problem is.  Mr. Knight has said he wants our expert to come to Portland to meet with people here in Portland, discuss what it is the expert is going to do, how he's going to analyze this, and then they will give him perhaps the hard drive.

I've said, "This is a CJA case.  We don't have the money for that."

Mr. Knight said --

THE COURT:  I will take a look at what's been

1    submitted.  I suspect that if what you're actually asking

2    for is some sort of email or telephone conversation between

3    the two of them to try to work out the best handling of

4    this, then there is money for that.  But I'll see what's in

5    the materials that have been submitted.

6              MR. RANSOM:  Thank you, Your Honor.

7              And just one other matter.

8              THE COURT:  Yes.

9              MR. RANSOM:  I want the Court to know we haven't

10   forgotten that we have an obligation to the Court on another

11   CJA aspect.  I'll take care of that.

12             THE COURT:  Thank you very much.  I look forward

13   to receiving it.

14             MR. RANSOM:  Thank you, Your Honor.

15             THE COURT:  We'll be in recess.

16             THE CLERK:  This court is in recess.

17             (Proceedings concluded.)

18

19

20

21

22

23

24

25

--oOo--


        I certify, by signing below, that the foregoing is
a correct transcript of the record of proceedings in the
above-entitled cause.  A transcript without an original
signature or conformed signature is not certified.


/s/Bonita J. Shumway                6/25/2014
_____       _____
BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
Official Court Reporter