1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3   UNITED STATES OF AMERICA,      )
                                    )
4            Plaintiff,             )   No. 3:12-cr-659-MO-1
                                    )
5       v.                         )
                                    )
6   REAZ QADIR KHAN,               )   September 11, 2014
                                    )
7            Defendant.            )   Portland, Oregon
    _____)

8

9

10

11

12

13

14

15                      **Oral Argument**

16              TRANSCRIPT OF PROCEEDINGS

17      BEFORE THE HONORABLE MICHAEL W. MOSMAN

18         UNITED STATES DISTRICT COURT JUDGE

19

20

21

22

23

24

25

```
 1
 2                         APPEARANCES
 3

 4   FOR THE PLAINTIFF:      Mr. Ethan D. Knight
                             Mr. Charles F. Gorder, Jr.
 5                           United States Attorney's Office
                             1000 S.W. Third Avenue, Suite 600
 6                           Portland, OR 97204

 7

 8

 9   FOR THE DEFENDANT:      Ms. Amy M. Baggio
                             Baggio Law
10                           621 S.W. Morrison, Suite 1025
                             Portland, OR 97205
11

12                           Mr. John S. Ransom
                             Ransom Blackman, LLP
13                           1001 S.W. Fifth Avenue, Suite 1400
                             Portland, OR 97204
14

15

16   COURT REPORTER:        Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
17                           1000 S.W. Third Ave., Room 301
                             Portland, OR  97204
18                           (503) 326-8188

19

20

21

22

23

24

25
```

1                    (P R O C E E D I N G S)

2          MR. KNIGHT:  Good afternoon, Your Honor.  We're

3    present in the matter of United States v. Reaz Khan.  This

4    is Case No. 12-cr-00659.  Ethan Knight and Charles Gorder

5    appearing on behalf of the government.  The defendant is

6    present, out of custody, with counsel Jack Ransom and Amy

7    Baggio.  And we're present today, Your Honor, on two of

8    defendant's motions:  a motion to compel discovery and a

9    motion to compel notice of search and seizure authority.

10         Your Honor, for the Court's information, I'll be

11   handling argument related to the motion to compel discovery

12   and Mr. Gorder will be handling argument relating to the

13   motion to compel notice.

14         THE COURT:  Thank you.

15         Let's start with the latter one.  And so it's a

16   defense motion.  I've reviewed what both sides have

17   submitted.  Is there anything you wish to add to what you've

18   submitted in writing on that motion?

19         MS. BAGGIO:  Your Honor, I will be arguing the

20   motion to compel notice of the search and seizure for the

21   defense.  And I want to make sure I understood that's the

22   one you wanted to --

23         THE COURT:  That's the one we're going to do

24   first, yes.

25         MS. BAGGIO:  Thank you, Your Honor.

1          Just briefly, Your Honor, I believe that it's

2   important for us to start out with the facts to which -- or

3   law on which the parties agree.  And first and foremost, I

4   believe that the parties agree that FISA does not change the

5   Government's discovery obligations.  The question then

6   becomes what are the Government's discovery obligations.

7   And I believe the parties still agree that the Government's

8   discovery obligations come down to Rule 12 and Rule 16 in

9   the Federal Rules of Criminal Procedure, *Brady v. Maryland*,

10  the Jencks Act, and then whatever is constitutionally

11  required.

12          And it's that last piece, Your Honor, that I think

13  that we would have to admit there is some gray area in terms

14  of what is constitutionally required.

15          THE COURT:  Can I interrupt for just a moment and

16  maybe toss in a couple of the thoughts I have about it and

17  see where that takes you in your argument.

18          So not only the parties agree, but I agree that

19  those are the governing standards here.  And it seems to me

20  that part of why there is this agreement about what FISA

21  does or doesn't require with the ability to challenge the

22  searches and seizures that led to evidence -- which is

23  really what we're talking about here -- is that at some

24  level, FISA has to some degree dropped out of the picture if

25  you are at that point.  At some level the government has

declassified something and given it to the defense, and now
the defense wants to challenge the legitimacy of the
acquisition of the evidence.  If they don't declassify
something and you don't know about it, then we're not having
that motion to suppress because you don't have it.

And so at that point, that's what you're talking
about.  You have received a number of materials.  You want
to challenge the legitimacy of the searches or seizures that
led to them coming to you, and that is, once the step I've
just described has taken place, that is largely governed by
the best we can do duplicating what's done in a regular
criminal case, with some, you know, caveats in place, I
suppose.

So if I understand your position correctly, you
have evidence that you want to -- you want to evaluate, at a
minimum, whether you can move to suppress it, and you
believe that you need to know more than you now know in
order to do that, right?

MS. BAGGIO:  That's correct.

THE COURT:  And you have, if I understand this
correctly from your pleadings and from the government's
brief in response here, you have two kinds of evidence:  you
have evidence that's been declassified and come to you; and
at least the government seems to suggest that you have
figured out that some of the evidence came just through

1    standard criminal investigative procedures like, say,

2    physical stakeouts or something like that.

3            Is that a fair description of what's gone on so

4    far for you?

5            MS. BAGGIO:  Yes, Your Honor, except I would add

6    to the last point, we may know that a Rule 41 search warrant

7    was used to obtain certain evidence but we might not know

8    all of the evidence, the source of all the evidence on which

9    the search warrant application was based.  So, in that

10   sense, while we may have some definitive answers as to some

11   of the evidence, we still may not know where it originally

12   came from.

13           THE COURT:  Right.  So the crux of your issue is

14   that you have a pile of evidence that maybe is in two

15   stacks, the two I've just described, and you may have some

16   rough ideas, but you certainly aren't sure if you can

17   identify by what authority any particular piece of evidence

18   was acquired?

19           MS. BAGGIO:  That's correct, Your Honor.

20           THE COURT:  And your contention is that there's

21   nothing about FISA or related national security law that

22   changes the fundamental equation that as to evidence that

23   you assume is going to be used against you because it's been

24   produced, you should have whatever -- you should have enough

25   to file a meaningful motion to suppress.

1          MS. BAGGIO:  That's correct, Your Honor.

2          THE COURT:  And the Government suggests, I think,

3    two things about that.  One is that you -- well, maybe

4    three.  One is that you sort of have a rough idea about this

5    dividing line between what you've received that's been

6    declassified and what you've received that just came through

7    nonclassified channels originally.  And I think I have your

8    answer on that.  Maybe a rough idea, but nothing very

9    specific.

10         MS. BAGGIO:  Correct.

11         THE COURT:  So that's one thought.

12         The other I'm not sure I totally understand, and

13   I'll ask the government more about this in a minute, but I

14   want to see if it is accurate as far as you know.

15         The government suggests that in conversations with

16   you -- and I'm now looking at page 5 of the government's

17   response to your motion.  I'm not sure I get this.  I'm

18   starting with you because you're the moving party and maybe

19   you can help me here.

20         The government suggests that in conversations with

21   you, something about those conversations has informed you

22   that if you're going to challenge the authorities by which

23   the declassified evidence came -- came to be seized, if we

24   will, that that's going to be FISA Titles 1, 3 and 7.

25         Tell me more about that from your perspective.

MS. BAGGIO:  Your Honor, from my perspective, informing us that they used Titles 1, 3 and 7 of FISA is insufficiently specific.

THE COURT:  Let me just start with that.  Is that what's happened?  Is that what's happened, first of all?  Have you been informed that the sources you ought to be thinking about challenging are 1, 3 and 7?

MS. BAGGIO:  By reading this memo, Your Honor.  I don't recall specific other conversations, other than after this was filed, in talking with the government about what we wanted.  But I have no more specific information than what appears here.

THE COURT:  Let's assume that means what it says, and that that's the road you ought to take.  Once again, just help me if this is where you are.  It seems like you are in a position to challenge the overarching constitutionality of those authorities, right?  You spoke last time we were together about how you might have to challenge the constitutionality of every possible acquisition authority there might be, and if this is a limitation that's meaningful, then as to just what I'll think of as systemic challenges to authorities, you can limit yourself and you can raise broad Constitution-based challenges to the legitimacy of those authorities.  Is that fair?

1          MS. BAGGIO:  We could raise facial challenges --

2          THE COURT:  That's the word I was thinking of.

3          MS. BAGGIO:  -- to those three titles.

4          However, the problem is that even within those

5    titles, there are so many different ways of doing so many

6    different things that it's our position that that's not

7    sufficiently specific.

8          And the second problem that we have, Your Honor,

9    is because of -- based on the discovery provided, it

10   suggests that this investigation went on for years and

11   years.  We're not certain which versions of these titles

12   were used.

13         THE COURT:  All right.

14         MS. BAGGIO:  And --

15         THE COURT:  So you have some problems even making

16   a facial challenge to those authorities.

17         And then the second thing the government says here

18   is that -- I guess a suggestion that these are the relevant

19   authorities, and that if you prevailed as to those

20   authorities, it would be dispositive of the case.  I guess

21   that's a way of saying that these are the authorities that

22   matter in this case.

23         And then, second, the suggestion that this --

24   well, it's not even a suggestion, I guess.  There's the idea

25   that this allows you to seek rulings against the government

1    on the constitutionality of or the government's compliance

2    with those provisions.

3          So I guess my first take was maybe yes as to the

4    constitutionality of it, but my impression is that you don't

5    think or don't have what you would need to challenge the

6    government's compliance with any specific authority.  Is

7    that fair?

8          MS. BAGGIO:  That is fair, both as to as-applied

9    constitutional challenges, as well as any statutory

10   violations that might have taken place.

11         THE COURT:  So whether the government sort of

12   followed the protocol set out in those authorities for

13   obtaining the evidence it got, you just don't know?

14         MS. BAGGIO:  That's correct.

15         THE COURT:  And you think the authorities you

16   cited to me in your briefing entitle you to know?

17         MS. BAGGIO:  That's correct.

18         THE COURT:  And that's kind of the crux of this

19   issue, isn't it?

20         MS. BAGGIO:  And may I add one other?

21         THE COURT:  Absolutely.  I didn't mean to -- I'm

22   just telling you what I thought your argument was, and now

23   you can help me with what I missed.

24         MS. BAGGIO:  Thank you, Your Honor.

25         One other point that really came out to me in the

government's briefing is footnote 2 on page 4, in which they
are saying they don't intend to rely on the authority of the
Terrorist Surveillance Program authorization of use of
military force or president's Article II power.

I understand from a driveby perspective it kind of
supports what the Court just referred to on page 5 if we're
just dealing with these three subchapters of FISA -- or
titles of FISA.  But one of the problems that I'm having
with this, Your Honor, is it's unclear to me how the
government is interpreting seizures and constitutionally
significant events, because based on some of the publicly
disclosed government surveillance practices, in combination
with some of the government's statements, for instance,
before the Privacy and Civil Liberties Oversight Board, we
have -- we're getting this information that the government
may take the position that it could conduct a bulk
surveillance of telephone metadata or Internet metadata or
perhaps even Internet communications under EO 12333 or under
the FISA Amendments Act, but in some of the different places
in which the government has made statements about this,
they've taken the position that, well, that initial seizure
isn't really a seizure, and in fact it's only when it's
later sorted and certain information is pulled out that
that's a seizure.

In another context, the government has taken the

1  position that later searches of a collected vat of

2  information, later searches of that even years later don't

3  constitute constitutionally significant events.

4          So my concern with the government's representation

5  is I'm not sure how they are reading search and seizure law

6  to say the only thing at issue here are Titles 1, 3 and 7 of

7  FISA.  So that is an additional concern, again based on both

8  the publicly available information and the discovery in this

9  case, which although the orders -- the orders seem to have

10 come about around 2009, based on the seized communications,

11 the email communications go back to 2005.  And so there

12 becomes a question in our minds under what authority were

13 those seized back in 2005.

14         Does that concern make sense, Your Honor?

15         THE COURT:  Yes.

16         MS. BAGGIO:  And I think one of the other things

17 that I -- that we agree -- and this seems like we're all

18 consistent on this.  On page 3 of its response, the

19 government cites a Federal Rules Decision case to say that

20 the government's obligations are satisfied when it has made

21 disclosures that sufficiently allow defendants to make

22 informed decisions whether to file one or more motions to

23 suppress.

24         This is what we're struggling with, Your Honor.

25 And if we take away the FISA overlay for a moment and

consider this a regular criminal case -- and Mr. Khan is

charged not with material support but with a complex

financial fraud -- and imagine that the government gives me

40,000 pages of information and they say, okay, here's our

evidence, here's your charge, and we use Title 18, Chapters

119 and 121.  And I know by reading those chapters that that

could have been a wiretap, that could have been ordered

under the Stored Communications Act, that could have been

the Congress's Assistance to Law Enforcement Act.  There's

all these different legal mechanisms within that larger

umbrella.

Now, I understand the point that you made earlier,

Your Honor, is they've narrowed that somewhat if we're going

to hold them to Title 1, 3 and 7, but even within the Title

1, 3 and 7, there's so many different ways to do things that

I submit I can't be effective and I can't evaluate whether

or not -- make an informed choice about whether I should

file a motion to suppress evidence when I'm not sure which

mechanisms were used.

And then if we add the FISA overlay, Your Honor,

back into it, another point I just wanted to highlight --

THE COURT:  Let me pause you there for a moment.

I take seriously your argument that you don't feel that you

had adequate information to know whether, or if the answer

is yes, then how to file a facial challenge to the

1    authorities.

2         I guess I thought your more fundamental argument

3    was -- Let me back up.  So that's an argument that you've

4    been given some information towards what you need but not

5    enough.

6         I thought your more fundamental argument was the

7    second one, which is I was under the impression you have

8    essentially no information that would tell you whether the

9    government complied with the methods set out for obtaining

10   it or not.  Am I wrong about that?

11        MS. BAGGIO:  No, you are correct.  That is

12   correct.

13        THE COURT:  The first argument is you've been

14   given something but not enough; but isn't the second

15   argument that you have, in terms of deciding whether to

16   challenge evidence based on the government's compliance with

17   the authorities, you wouldn't know the first thing about

18   whether to file or when to file, would you?

19        MS. BAGGIO:  That is true, but I also recognize

20   that, as outlined in the government's response, there are

21   mechanisms for that to happen in a special way in a FISA

22   case, but I don't even know which sets of statutes or which

23   subsections or which definitions to look at so that I can

24   draw a road map for Your Honor to go through and look at

25   them.  That's the kind of narrowing that we're hoping for.

THE COURT:  And then you said -- your analogy was
to a complex financial fraud case, and then you said if you
add the FISA overlay, then what?

MS. BAGGIO:  Thank you, Your Honor.

If you add the FISA overlay, you have not only
Rules 12, 16 and the federal constitutional requirements and
considerations, but we also have the express statutory right
for this defendant to challenge in this proceeding the
lawfulness of the seizure and whether the seizure occurred
in conformance with the application and order.

And, Your Honor, my position is that that
statutory right to say that this is an unlawful seizure is
more than us being able to do a driveby "the FISA statute is
unconstitutional on its face."  To interpret that statutory
right under -- it's under 1806(e) for the electronic motions
to suppress and 1825(f) for the physical searches.  For that
statutory right to have any meaning, then we need to be
given sufficient information to be able to challenge it.

And it's our position, Your Honor, that only with
more detailed disclosures, at a minimum, of the statutes,
subsections and versions used, but also that it needs to be
tied back to at least classes of evidence, because that way
we can more fully understand the picture.  I can make an
informed decision about whether to file a motion to suppress
and so that we can understand the exploitation analysis,

because so many of these investigative methods allow

retroactive information to be produced that I can't even

possibly know when things happened, whether an order was

issued in 2005 to get email or whether that happened in 2012

and was able to retroactively get email.

And therefore, Your Honor, it's our position that

not only does a regular criminal case require the type of

notice requested in other pleadings, but FISA further

recognizes the necessity of us being able to exercise that

statutory right to move to suppress evidence.

THE COURT:  Did you just say that you needed

further identification of the authorities in order to do the

exploitation analysis?

MS. BAGGIO:  And tie it back to individual pieces

of evidence.

THE COURT:  I didn't know what you mean by those

two words.

MS. BAGGIO:  Yes, Your Honor.

Well, if, for instance, if we're looking at, for

example, a search warrant application, and the search

warrant application describes an investigation that took

place in 2005, either to a certain investigative process in

2006 and 2007, and then I can know that if a bad search

happened in 2006, that that would then have a domino effect,

and I can make a *Wong Sun* fruit-of-the-poisonous-tree

1  argument as to the government exploited that illegality.

2         THE COURT:  Seems to me that the derivative use

3  would be by exploitation.

4         MS. BAGGIO:  Yes, Your Honor.  I'm sorry.

5         THE COURT:  It's a perfectly good word, I just

6  didn't know what you meant by it.  I guess that makes it not

7  a perfectly good word.

8         One last question, then.  You -- let me just ask

9  what position would you be in if there were no further or --

10  no more linkage of authorities to pieces of evidence but a

11  more specific identification of authorities with regard to

12  your facial challenge?  Why would you be able to make a

13  facial challenge if you knew exactly what authorities had

14  been used without knowing precisely what pieces of evidence

15  came from the use of those authorities?

16         MS. BAGGIO:  So long as that disclosure included

17  specific enough reference to a section or subsection, and

18  the version, Your Honor, I think based on having that

19  information, I could do a facial challenge.  I may still be

20  unable to conduct an as-applied challenge or to examine

21  whether they complied with the statute.

22         THE COURT:  I was just sticking with the facial

23  challenge.

24         You could get there probably, and you might even

25  have, depending on the nature of the disclosed specific

authority, you might even have a pretty good idea what evidence came from it?

MS. BAGGIO:  That is correct, Your Honor.

THE COURT:  All right.  Thank you.

Mr. Gorder, let's start with this concept of what's needed to make an adequate facial challenge, and then we'll talk about what's needed to make an adequate specific or as-applied challenge to the government's compliance.

MR. GORDER:  Very well, Your Honor.

You know, we are cognizant and understand the dilemma that defense counsel is in in cases like this.  To use her analogy, if this was a fraud case and we gave them records that said it came from criminal wiretaps and search warrants, she would get the affidavits in support of the wiretap orders, the copies of the orders, and be able to, you know, basically figure out her probable cause argument, if she desired to make that.

That's not the situation that Congress set up with regard to FISA.  The situation is kind of in the reverse. So we have gone about as far as we can go with regard to classified techniques of acquiring foreign intelligence.

THE COURT:  That's, I think, a little -- relevant to both points I'm interested in, runs more towards the as-applied challenge.  So the idea, at least, that we're left with is that -- without putting words in your

1  opponent's mouth -- I think there's a sort of a minimum that

2  is sought by way of identifying the actual authorities

3  relied on in this case, such that just a challenge to the

4  constitutionality of those authorities could be made.  So I

5  suppose that could be made today with the disclosures you've

6  made.

7       Actually, let me back up a little bit.  Am I

8  reading your brief correctly that in some way the defense

9  has been told which authorities they ought to think about

10  challenging here, maybe informally?

11       MR. GORDER:  Well, both formally and informally,

12  Your Honor.  The formal way was the notices that we filed

13  with the Court, which indicates that the government intends

14  to use evidence derived from FISA Title I and FISA Title II

15  and FISA Title VII.

16       THE COURT:  All right.

17       MR. GORDER:  And so basically you've got

18  electronic surveillance under FISA, physical search under

19  FISA, and the FISA Amendment Act changes that occurred in

20  2008.

21       And I think to make a general facial challenge to

22  those statutes, they have what the FISA statute says -- or

23  what Congress says is required to make those kinds of facial

24  challenges.  I mean --

25       THE COURT:  There would have to be -- I mean,

there might be truly overarching arguments made to the FISA

and the FISA Amendments Act in their entirety, but to

challenge the specific methodologies authorized by either of

those acts today, if Ms. Baggio wanted to do that, she'd

have to challenge all of them contained in those three

chapters or subsections, right?

MR. GORDER:  Yes.  But --

THE COURT:  Why is that better than the only way

permitted under law, more detailed identification of what

was relied on here?

MR. GORDER:  Well, I'm not sure I understand what

more detail the defense would need to make the facial

argument.  I mean, the electronic --

THE COURT:  They know there was an electronic

surveillance but they don't know what kind of electronic

surveillance.

MR. GORDER:  Right.  But the statute that

authorizes it, all electronic surveillance is the same.  If

you want to make a constitutional challenge to the

government's ability to do FISA electronic surveillance, you

look at Title 1 of FISA.  I mean, the statute doesn't make a

difference between different kinds of electronic

surveillance.

THE COURT:  I suppose the idea is that some

methods of engaging in electronic surveillance are on weaker

constitutional footing than others.  Maybe going after
stored emails is weaker in some way -- I haven't thought
about this, but weaker in some way than going after
something else, so the idea being you might not have just
one generic constitutional argument.  You might have better
ones for some methods and weaker ones for other.

MR. GORDER:  Well, I think, Your Honor -- and
again, I don't intend to say that this is an easy task, but
that is what FISA requires.

THE COURT:  Well, that's your position, is that
more detailed identification than what you've done so far is
beyond what Congress contemplated by way of notice?

MR. GORDER:  Correct.

THE COURT:  And what's your authority for that,
the authority that would say that identifying not just the
overarching authority but the specific methodologies used is
not permitted here?

MR. GORDER:  Well, I think, Your Honor, the
authority that we have are the cases that upheld the
in-camera ex parte process that is used to challenge FISA
and to get into the as-applied analysis in any particular
case.

Second, as we mentioned in our brief, I mean,
Congress did require more specific notices in certain cases
but not in the overall just general electronic surveillance

1    area or physical search area, but they did make an exception

2    for certain kinds of notice in certain circumstances.  So --

3              THE COURT:  All right.  Let's turn, then, to the

4    idea that -- I guess only -- again, I'm not trying to make

5    you say something you didn't say, but sort of hinted at in

6    your brief is the idea that a person ought to be able to

7    challenge not only the constitutionality of searches but the

8    government's compliance with the authorities that allow for

9    those searches.

10             Sitting here today, does Ms. Baggio have what she

11   needs to challenge the government's compliance?  Your

12   analogy to financial fraud was she would be able to know

13   whether there was PC to challenge it.

14             MR. GORDER:  The answer to that question is no,

15   she does not.  The applications that went to the FISA board

16   are classified, she does not have access to those, and the

17   process that Congress has set up and that the courts have

18   upheld as constitutional is should she file a motion to

19   suppress, which she undoubtedly will next Monday, Your

20   Honor, we will be preparing an ex parte in-camera classified

21   brief for you to examine that establishes, in our position,

22   that the applications were proper, that the court orders

23   were authorized by law, and that the government complied

24   with the requirements of the various orders.

25             The procedure that Congress has set up and that

the Courts have upheld is that you will examine those
yourself in camera, and only if you find it necessary to
bring Ms. Baggio into the equation to make a decision, which
you -- you know, we don't think you will need in this case,
as hasn't happened in any other FISA case to date.

But that is the way that the as-applied and
compliance mechanism is examined by the courts in this case,
because the details of FISA surveillance -- physical search,
et cetera -- are classified.  We're not allowed to publicly
discuss what the target of a FISA is, the details of the
time period, court orders and that sort of thing.  So that's
just the way Congress has set it up, and the courts to date
have upheld it as an appropriate way to balance the national
security issues that are contained in FISA applications and
orders and the criminal process that, you know, we're
engaged in today.

THE COURT:  So if I agreed with you, then going
forward, what would happen is that for facial challenges,
Ms. Baggio would be able to make a very sort of programmatic
or overarching challenge to the constitutionality of FISA
and the FAA, at a minimum, and to the degree that she
thought she had particular arguments that got at some but
not all of the methodologies used, she'd have to just make
all of those arguments, not being sure that those
methodologies were used in this case, challenge the

constitutionality of them.

And then as to the idea that the government failed to follow or failed to comply with the requirements for using those authorities without knowing one way or the other whether that was the case or not, or even if she had a good argument or not, she'd just have to move to suppress for failure, for example, failure of the government to show PC to the FISC, and you'd respond ex parte in camera?

MR. GORDER:  That's correct, Your Honor.

And she could certainly use whatever discovery she has to date to supplement those arguments.  I mean, I have seen in my own cases defense counsel take the discovery, and based on discovery make an argument that their client couldn't have been found to be an agent of a foreign power, for example, or somebody else couldn't have been found to be an agent of a foreign power.

But, again, we're cognizant of the difficulty that she is in in trying to make those arguments because she doesn't have the supporting documents, but that's just the process that's been set up by Congress and has been found constitutional.

THE COURT:  And then if I could refer to page 4 for just a moment of your brief, I think you're asserting or at least suggesting that enough discovery has been given that the defense either can or has figured out which pieces

1   of evidence it's received have just come from non-FISA

2   means.  Is that right?

3          MR. GORDER:  Well --

4          THE COURT:  I'm not sure I understood what you

5   were saying there.

6          MR. GORDER:  I think what we had said was they

7   have enough information to make a determination,

8   particularly given the notice that we have provided as to

9   what parts of FISA are important to litigate in this case,

10  and in a general sense can figure out most of the time, for

11  example, an audio call that was recorded, where it came

12  from.

13         THE COURT:  What do you mean by saying that they

14  have -- leaving FISA aside, they have successfully divined

15  from discovery that evidence may also have been collected

16  pursuant to grand jury, physical surveillance, witness

17  interviews, border searches?

18         MR. GORDER:  Right.  I was referencing the chart

19  that Ms. Baggio has in her pleading where she goes through a

20  number of those items.

21         And then obviously, you know, an FBI 302, for

22  example --

23         THE COURT:  Of a witness interview?

24         MR. GORDER:  -- of a witness interview makes it

25  clear that it was a witness interview.

1    THE COURT:  So FISA just wouldn't apply and she

2 could challenge it by any of the standard methods that were

3 available?

4    MR. GORDER:  Correct.

5    THE COURT:  All right.  Thank you.

6    Ms. Baggio.

7    MS. BAGGIO:  Thank you, Your Honor.

8    Three quick points in rebuttal.  First of all, the

9 government has said that we can challenge the statute's

10 constitutionality by just looking at the statute, and if

11 it's an electronic seizure, we challenge the FISA statute

12 for electronic seizure.

13    I'm trying, and it's really, really difficult,

14 Your Honor.  If we start with a good definitional section --

15 for example, Mr. Gorder raised the example of, well, some

16 attorney tried to argue whether or not his client could have

17 been an agent of a foreign power.  I think there are about

18 ten different definitions of how somebody can be an agent of

19 a foreign power.  There are seven different definitions of

20 how a person can actually be a foreign power directly.  And

21 I'm not even sure where we fit into any of these pieces.  So

22 even when I was preparing for argument, I was trying to do a

23 visual of how all these ways could fit together, one piece

24 of evidence, all the different ways by which the government

25 might have obtained it, and I couldn't do it, it was just so

complicated.

So if we look at just, for example, the chapter on electronic surveillance, there is a whole statutory scheme if the electronic surveillance is seized without an order. There's a whole different statutory scheme if the electronic surveillance is obtained pursuant to an order. So even just narrowing by half, it would be of great assistance to the defense, but we still have the problem of so many definitions that come into play, and again, the problem of different versions being in effect at different times.

The same thing applies to the physical searches chapter, where they have a whole section that explains how physical searches can be done by presidential authorization and all the complicated processes associated with that versus how it can happen pursuant to a court order.

So that is what we're struggling with here, Your Honor, and I believe therefore that simple references to Title 1, 3 and 7 is insufficient.

The government also mentioned, well, there is an audio call, so clearly it's obtained by FISA. Well, we don't know if it's FISA or if it's the FISA Amendments Act.

And so those types of pieces of information will allow me to do my job but also to be able to focus the Court's attention on the different pieces of FISA that are relevant and not waste anybody's time on what's not

relevant.

The last point that I just wanted to mention, Your Honor, is the government does make the argument that other parts of FISA require more specific disclosures. And I would like to just respond to that by saying if we look at each of those other FISA provisions that require more specific notice of an application, of a date of an order or of the information obtained I think are some of the things that those more specific notice provisions require, all of those involve people who aren't charged with anything. And I think that is absolutely the difference here, that Congress looked at someone who is charged in a criminal case, and when they're charged in a criminal case, the notice provisions come into play, the statutory right to move to suppress moves into play, as do the Rules of Criminal Procedure and the constitutional protections. None of that applies in the examples cited by the government.

THE COURT: One of Mr. Gorder's arguments is that we're not writing on a blank slate here; that the Ninth Circuit, at a minimum, and other courts have spoken on what's allowed and not allowed. To what degree do you view what you're asking for as either open or foreclosed by Ninth Circuit authority? In other words, is there any theory under which your argument is simply suggesting that existing authorities have it wrong and I ought to reconsider versus

just open field where no authority prohibits what you're
asking for?

      MS. BAGGIO:  I believe we're in the latter
category, Your Honor, not the former.  I'm aware of no one
in any other case that has made this type of request, not
for access to the applications and orders or challenging
that process set out in FISA.  This is different, Your
Honor.  We're asking just for more specific notice of the
authorities that were used and the versions.  We are also
asking for it to be tied to at least classes of evidence.
I'm not asking to read the application, I'm not asking to
look at the order.  I just want the universe of
possibilities to be reduced dramatically to just the ones
that are relevant to this case.

      THE COURT:  All right.  And so I think I
understand your position on challenging compliance, that you
can do a better job of it if you -- if the field is narrowed
somewhat for the authorities that had to be complied with.
But you're not asking today for the underlying documents in
order to see whether the affiant stated probable cause to
the FISC?

      MS. BAGGIO:  Precisely, Your Honor.  And if we
know that we're in the section that allows recording of a
phone call without a court order, then I would be setting
out for the Court these are the processes, now that I know

1    we're in this one and not the court-ordered section of FISA.

2              THE COURT:  Thank you.

3              MS. BAGGIO:  Thank you.

4              THE COURT:  Let's turn to the other motion.  And I

5    guess, then, Mr. Knight and Mr. Ransom, you're handling

6    those; is that right?

7              MR. RANSOM:  That's correct, Your Honor.

8              THE COURT:  So once again I've reviewed what you

9    submitted and you've had a chance now to review the

10   government's response.  Anything you wish to add to what you

11   said in writing?

12             MR. RANSOM:  Yes.

13             In regard to the statements of the defendant, Your

14   Honor, the government's position is it has provided all

15   statements that are relevant and material.  It is our

16   position that the government has not.

17             I'd like to reference the emails themselves which

18   have been obtained through either FISA or the FISA

19   amendment.  We assume there are a significant cache of

20   documents that are held, the metadata, and that these are

21   reviewed pursuant to keywords that are provided.  Let's say

22   in this case the keywords are "Reaz Khan," and of those, a

23   thousand documents appear.

24             And then there is a filter, and in the first

25   filter -- and this is all supposition based on what I have

read.  The first filter, let's say it's reduced to 800

emails.  And then there is a second filter, and let's say

the second filter is reduced to 500 emails.  Those 500

emails are provided to us, but we are not provided the other

500 emails.  And those are all statements of the defendant.

And Rule 16(a)(1)(E)(iii) provides, "Defendant is

entitled to documents which were obtained from or belonged

to the defendant."

It is our position that all of those emails were

obtained from or belonged to the defendant, and we are

entitled to all of those emails.  All of the emails obtained

through FISA or FAA fit that criteria.

THE COURT:  Now, you started out saying that the

government asserts it has given every one of those that are

relevant or material.  That's incorrect.  I guess I hear you

really saying that the governing standard isn't whether

they're relevant and material but rather the standard you

read out of Rule 16, which as I understand your position

doesn't require you to show relevance or materiality, just

requires you to show that it belonged to your client.

MR. RANSOM:  That's our first position, yes.

THE COURT:  So you don't really feel obligated to

show the relevance and the materiality of the undisclosed

statements of your client, you think you're entitled to them

just under Rule 16, and you get to look at whether they're

relevant or not, but any statement that belonged to him you

should get.  Is that your position?

MR. RANSOM:  That's our first position, yes.

THE COURT:  All right.  So when you say "first," I

assume you have a second position.  What is that?

MR. RANSOM:  Your Honor, our second position is

what is relevant.  And there's no definition in Rule 16.

But Rule 401 provides it would have a tendency to make a

fact more or less probable than it would be without the

evidence and would have a consequence in determining the

action.

It is further our position that all of those are

relevant because they do and will have a tendency to make a

fact more or less probable.

Now, let me give you an example.  Let's suppose

hypothetically that we wanted to demonstrate that the state

of mind of Mr. Khan was such that he never envisioned in any

fashion by anybody under any circumstances a violent jihad

or murder of Muslims.  And what way we would show that state

of mind would be what he had written over the course of

years during which all of these emails were captured.  So,

in our opinion, those are all relevant and material under

that hypothetical to our defense.

Now, I don't want to set forward precisely what

our defenses may or may not be, but I just use that

hypothetical as an example.  And if we go back to what I was
talking about in regard to the filtering, who is it that
says that an FBI agent who has a thousand emails and filters
those down to 800 has any idea what is relevant to
Mr. Khan's defense in which he hasn't even been charged yet?

THE COURT:  Under your theory of relevance, they'd
all be relevant, wouldn't they?

MR. RANSOM:  Yes, they would be.

THE COURT:  If there are 10,000 emails, and 500
have been disclosed to you as inculpatory, wouldn't your
theory be the more the better in terms of undisclosed
emails?  Because you'd like to show that, you know, the
500,000 times he wrote emails about his kids and soccer and,
you know, Portland Water Bureau or whatever else might be
there.  That's the idea, isn't it?

MR. RANSOM:  Something like that, yes.

THE COURT:  All right.

Let me just ask, I suppose there's another avenue
for doing that, right?  I mean, your -- you have available
through nonclassified means in a variety of ways the story
that your client, you know, wrote a number of emails, and
almost by definition the ones you've received that have been
declassified are the only potentially inculpatory ones.
Can't you advance that theory at least in your hypothetical
and a lot of other ways?

1      MR. RANSOM:  I'm not sure I understood the

2  question.

3      THE COURT:  Well, one simple way involves your

4  client testifying, which I realize is problematic.  I mean,

5  your client can say, "Well, they've given me 500 of my

6  emails, but I was on the computer all the time.  I must have

7  written 100,000 emails over that time and they were on all

8  kinds of subjects."

9      MR. RANSOM:  But as you noted, that may or may not

10  occur.

11      THE COURT:  Okay.  Thank you.

12      MR. RANSOM:  The other aspect of that, Your Honor,

13  is that a FISA order is in many ways like a warrant.  It's

14  not a warrant but it's in many ways like a warrant, and it

15  should be treated like a warrant in regard to a return of

16  items or objects that were obtained during the search.  In

17  other words, there should be a listing of everything that

18  was obtained which should be made available to the defendant

19  to review, just as he would be able to if it were in fact a

20  search warrant.

21      THE COURT:  That might well be true in the sense

22  that if you and I were writing the statute, that should be

23  what happens, but is that what the law says about returns of

24  these sort of warrants?

25      MR. RANSOM:  Well, that would be only under Rule

41.  But I don't think it speaks to that issue.  I'm
suggesting that it should be treated just as if it were a
warrant and should be treated in the same way, requiring
that there be a return identifying the objects that are
seized.

THE COURT:  You're suggesting that the principles
that gave us Rule 41 ought to be applied here even if Rule
41 doesn't apply?

MR. RANSOM:  Correct, that's what I'm saying.

THE COURT:  All right.  Thank you.

MR. RANSOM:  Your Honor, if I can move to No. 7.
This is the one where we ask for them to provide evidence of
their theory of "at peace," which is required in Section
956(b).

In their response, the government says that it
will not proceed under 956(b); therefore at this time I
would like to make an oral motion to have that stricken from
the indictment.

THE COURT:  To the degree the indictment reflects
that theory?

MR. RANSOM:  Yes.

THE COURT:  The "at peace" theory?

MR. RANSOM:  Yes.

THE COURT:  Mr. Knight, any response to that
specific point?

1          MR. KNIGHT:  The government would object at this

2    point in time to the Court formally striking it from the

3    indictment.  I believe the government has the authority to

4    elect a theory, and it has done so.  However, since we've

5    obtained no discovery from the defense at this stage, I

6    think it would be irresponsible of the government to fully

7    commit, other than what we've committed to in the briefs, to

8    strike from the indictment that language.  We've articulated

9    what our position is with respect to the statute, but I'd

10   ask the Court not grant the motion at this time.  Certainly

11   it's something we can revisit as we move toward trial.

12          THE COURT:  All right.  I'll think about that.

13   Certainly the operating position right now is that whatever

14   happens with striking or not, the government has committed

15   to this course of action, and that's not alterable at this

16   point, absent intervening circumstances.  But if we just

17   move forward with the government putting on its case, then

18   I'm not going to allow them to change their mind down the

19   line and move to an "at peace" theory later.  You can sort

20   of take that to the bank at this point.

21          MR. RANSOM:  Thank you, Your Honor.

22          Your Honor, on No. 18, the indictment in this case

23   alleges that there was a bombing on May 27th, 2009, and Ali

24   Jaleel was the suicide bomber.  There has never been

25   presented one scintilla of evidence from the bomb site

itself that would identify Ali Jaleel as the suicide bomber.
The FBI was present at the scene at some point in time.
We've not been provided with any reports from the FBI
regarding what, if any, materials it obtained from Pakistani
authorities or the authorities of the city wherein the
bombing occurred, stating that they had no relationship with
Pakistan and could not compel such documents.

Now, the FBI agent did say, in a document that we
have possessed, given to us by the government, that he
attended several days of meetings regarding the bombing and
the material used in the bombing.  We've received no reports
whatsoever of any of the meetings that the FBI agent
attended, and we all know the FBI well enough to know that
if an agent attended a meeting, there is a 302 regarding it.

The agent also provided what he calls a timeline.
And it says, "Timeline (per police reporting)," and then he
sets forward basically six aspects of what occurred during
the bombing, the suicide bombing.

Again, that would certainly indicate, if it were
per police reporting, that he had seen police reports.  We
have none of those.

This is one of the most crucial aspects of the
case, what occurred during the bombing that would identify
Ali Jaleel as the suicide bomber.  And we should be entitled
to all evidence, all reports, all documents pertaining to

1    that.  We have virtually none.

2         THE COURT:  "Virtually" means just what you read

3    me is all you have?

4         MR. RANSOM:  We have a report of the agent who was

5    given parts of the bomb to send back to a laboratory in

6    Virginia for analysis by the United States and then returned

7    to Pakistan.  Pakistan at this point in time had virtually

8    no laboratory adequate to do that kind of investigation.  So

9    the agent was given those pieces.  There are photographs of

10   pieces.  There are no fingerprints on those pieces, but

11   that's all he had at that point in time regarding the

12   bombing.

13        THE COURT:  That was photographs of the bomb

14   pieces plus some kind of report of the analysis?

15        MR. RANSOM:  No, just the fact they were sent to

16   the United States; and yes, a report from the laboratory as

17   to what they were, and then they were returned.

18        THE COURT:  All right.

19        MR. RANSOM:  But the reason it is even more

20   important is we have newspaper articles at the time of the

21   bombing that come from Pakistan, in which they say persons

22   were arrested who were involved in the bombing; persons who

23   were involved in the bombing were Indian; six persons were

24   arrested, one person was killed.  So there are all these

25   newspaper reports that suggest that there were other persons

involved in the bombing and not this person, Ali Jaleel.
That's why reports from there are so important.  But, again,
we have nothing and we have no way of getting anything
except through the government.

So we would ask that they be compelled to obtain
such information, Your Honor, if they do not presently have
it.

I'd also like to look at No. 29.  What we're
asking for is co-conspirator statements.  And we may address
this later, but the response that the government gives is
that they will identify the co-conspirator statements they
intend to use in their trial memorandum.  That's also said
in No. 31.

The problem is there are 37,000 pages of
documents.  We have no idea who the alleged co-conspirators
are, because in the indictment itself, it says that Ali
Jaleel is an unindicted co-conspirator, but there are
other -- as you know, the usual language, there are other
conspirators known and unknown to the grand jury, but no
further identification.  And there is nothing in the
discovery that's been provided that identifies who the
co-conspirators are.

And this, of course, is important as a time
mechanism for the Court, because at some point we're going
to end up in an 801 argument about what is admissible, what

is not, who is a conspirator, who is not a conspirator, was this was made during the course of the conspiracy, was it not.  And it is important at this juncture we have an identification of those matters so that we can make the matter easier for the Court when we proceed, as well as easier for ourselves in what to investigate and who to investigate and how to investigate.  We would ask that that be compelled also, Your Honor.

THE COURT:  Anything further?

MR. RANSOM:  No, Your Honor.

THE COURT:  I don't need to hear from you on the motion to strike the indictment, but there are those three other issues, defendant's statements, what's called No. 18 and what's called No. 29/31.

Let's start with defendant's own statements.

MR. KNIGHT:  Thank you, Your Honor.

And I identified three separate arguments Mr. Ransom made in support of his position that the government should be providing all of the defendant's statements.

The first argument I heard was that the documents or the email statements of the defendant are indeed documents as that phrase is understood under Rule 16(a)(E)(iii) of the Rules of Criminal Procedure.

To my understanding, this is a new argument not in

the briefing and not one supported by any law.  I think a

reading of the statute itself would suggest that documents,

as in a tangible item, is something that is indeed different

from a recorded statement of the defendant, which we are

interpreting an email in this case to be, which is under

16(a)(1), and has attendant to it a requirement that the

statement be indeed relevant.

I think the fact that the rule itself

distinguishes between tangible documents and relevant

statements supports our plain reading of the rule, which is

an email does indeed need to be relevant to be discoverable

under Rule 16, and that the notion that any recorded

statement of the defendant in the form of an email is per se

a document defies common sense and certainly the other rules

of discovery.

So that's --

THE COURT:  I don't know why it defies common

sense.  I have two choices:  Is an email more like a written

paper document or more like a recorded phone call basically,

right?  Those are my two choices.

MR. KNIGHT:  Yes.

THE COURT:  So why does it defy common sense to

say it's more like a written paper document than recording

somebody's phone calls?  You type it.

MR. KNIGHT:  You do, but it's been treated, at

1   least insofar as the law as it relates to surveillance, as

2   the type of item that is managed, seized and discovered

3   under the rules of electronic surveillance.  So in that

4   sense, we believe it is more akin to that.

5            Second, the argument that it defies common sense

6   speaks more to the fact that the other laws of discovery, of

7   course, speak to relevance and materiality as being the

8   touchstone of providing documents and materials.  There's no

9   criminal case that I'm aware of --

10           THE COURT:  You mean relevance and materiality are

11   the touchstone for non-documents and non-materials, right?

12   I mean, if you --

13           MR. KNIGHT:  Well --

14           THE COURT:  Rule 16 suggests that if you take

15   documents from a defendant, then you've got to tell him

16   about all the documents you took, absent an inquiry into

17   relevance, right?

18           MR. KNIGHT:  Yes, but I think that contemplates

19   physical documents.  That's precisely the point.  I think

20   the history behind the rule is to protect the scenario where

21   documents are physically seized from an individual, and to

22   ensure that some notice is provided, and the defense knows

23   and has the ability to use the items that are taken from the

24   defendant in discovery.  But the fact --

25           THE COURT:  That privilege isn't really as much a

Rule 41 concept as a Rule 16 concept, isn't it?  Everything

you physically take from the home, in some manner or another

you have to account for it to the person that you took it

from.

MR. KNIGHT:  It is.  I suppose that gets back to

Mr. Ransom's argument that the Court should be applying a

Rule 41 analysis in analyzing whether a full return of the

emails would be appropriate.  And our position is that it

should not.

But I think it's fair to say there's no

controlling legal authority that has held that an

electronically obtained communication is somehow

qualitatively different from a recorded statement of the

defendant under Rule 16(a)(1), and therefore the government

is required to provide all recorded statements.  And that

is, as I understand it, what the argument is.  So the

government's argument is twofold.

THE COURT:  Is there case law specifically on that

under Title III?

MR. KNIGHT:  I don't know, Your Honor.

THE COURT:  The prevailing practice under Title

III is what is or is not the identification of every

recorded statement absent any inquiry into relevance and

materiality?

MR. KNIGHT:  Well, in theory, though, you can have

recorded statements that relate to a different investigation
that would not be turned over in discovery in the primary
case.  I mean, that again gets back to the argument that
this interpretation of Rule 16 is not consistent with the
practice of criminal discovery, in that if discovery is
being provided, it is relevant because it is relevant to the
underlying charge, but if hypothetically a defendant is
under investigation for something else, the government
wouldn't be required under Rule 16 to turn that over as
well, which certainly this interpretation of the rule would
require.

THE COURT:  So that's your argument on Rule 16.  I
think you've pretty much hit on what you want to say on Rule
41, then, the same idea, that you don't think that principle
applies here?

MR. KNIGHT:  Not only does the principle not apply
but there's already a statutory scheme in place, to the
extent items are obtained under the Foreign Intelligence
Surveillance Act, there is a process not only to challenge
but that governs the government's use and disclosure of that
material.

THE COURT:  Specifically under Rule 41?

MR. KNIGHT:  Well, as it relates to FISA, but
that's what distinguishes it from the Rule 41 requirement.

THE COURT:  The third argument is a relevance

argument that in some fundamental way in the posture of this case there's at least one hypothetical defense that would make it helpful to the defense, if we use that definition of relevance, to have every innocent email there is in order to make the defense that the picked inculpatory emails need to be read in the context of a much weightier volume of innocent emails.

MR. KNIGHT:  Yes.  And I think really there are two problems with that argument.  I mean, the one is factually, I don't think that squares with the type of charge in this case.  In other words, what has been alleged in this case is a conspiracy that ultimately leads to a narrowing confined active material support related to a specific incident.

What dovetails with that is the case law, which does not support Mr. Ransom's position.  Courts have held -- and I think the best case for this is in the Second Circuit in a case called *Gambino*, which deals specifically with whether or not evidence or information the government has in its possession of non-criminal activity is relevant for underlying criminal charge.  And that court and other courts have held that it's not.  It's simply volume of material related to not engaging in physical activity is not probative of an underlying -- of the criminal case and the criminal charge in the underlying criminal case.

And I think the final point on that is what the Court alluded to, which is if that indeed is the defense, no one is in a better position to put that on than the defendant himself, and he can do that even without testifying.  And this typically happens, to the extent a court admits it at trial, and that is through the presentation of character evidence or investigation or any other kind of evidence of what the defendant may have engaged in during an alleged time period that was not criminal.

And a final point I'll make on this, because I think it is relevant for the Court's consideration of this argument, and that is the government did ensure in its review of discovery and was cognizant of the fact that a statement hypothetically that the defendant made repudiating this sort of conduct or violence or anything of that nature, the government interpreted it to be something it would have to disclose if they indeed discovered that.

So we're not suggesting that we weren't aware of statements that didn't relate to the conspiracy itself.  We were cognizant of the need to watch out for that certain behavior.  So I think it's not supported by law, the government complied with its obligations, and there are other ways he can present this defense.

THE COURT:  On this last point, if it becomes

necessary -- just sort of thinking out loud here -- is it going to be possible in this case for the jury to learn even without the defendant's own testimony that of the X number of emails the government is relying on, those occur as a fraction of a larger number of all the emails, and the jury could learn what that percentage was?

MR. KNIGHT:  In this stage, I don't know the answer to that, Your Honor, because it relates to information that is at this point in all likelihood classified about the scope of the investigation.  However, I can foresee a situation where the defendant certainly wants to make that argument and the government may propose to the Court a number of solutions that may relate to a stipulation about the investigation or the scope of this investigation so that that argument could be made in front of the jury about what the Government did and what it ultimately obtained.

THE COURT:  Let's turn to No. 18, then.  And I hear Mr. Ransom really making two arguments there.  One is that you ought to have disclosed every shred of evidence that gets at whether Ali Jaleel really died at the scene or not.  And I should say that you ought to disclose every shred of evidence you have.

And then the second is that you ought to be -- if the answer to that is already done, we've already done that,

then you ought to be tasked with your best efforts to obtain what's out there that hasn't already been obtained.

Could you respond to those two positions?

MR. KNIGHT:  Certainly.  And the second argument I think speaks to the larger issue with this area of discovery in this request, and that is this:  it is important I think again to point out that the bombing itself took place on foreign soil.  It did not involve the death of any American citizen.  The United States government was not investigating this act, as it did not again relate to any of its citizens.

The material that the government has provided in discovery, it has because, as luck would have it, an FBI bomb technician was at that point in time, during the point in time of the bombing, assigned in Pakistan and provided assistance to the Pakistani government in investigating the bombing.  And to that end, the government has provided everything it has about what that agent did in discovery:  the testing assistance he provided, a PowerPoint he produced about what he learned at the scene itself, and even some internal communications that Mr. Ransom read from that may arguably be *Jencks* material that go to that.  And that speaks to something he said, which is the FBI must have written the report.

Again, this was not an FBI investigation, so the FBI did not go to a -- a site on foreign soil and conduct a

1    fulsome investigation when it did not involve a U.S.

2    citizen.  So we have given what we have in the FBI's

3    possession.

4         THE COURT:  So your short answer to the idea there

5    must be a report written by the FBI is that you haven't

6    disclosed yet is that you denied that?

7         MR. KNIGHT:  That's correct.

8         THE COURT:  And to the idea that the agent there

9    referenced her "police reporting," which presumably, since

10   it's the word "police" would mean Pakistani police, what's

11   your position on whether you have that and it should be

12   disclosed?

13        MR. KNIGHT:  Well, we don't have it, and if we

14   did, we'd turn it over.  I think the point there -- and

15   we've said this separately in pleadings before the Court --

16   that the government has formally requested this information

17   from the Pakistani government related to the bombing itself

18   and the information that it may have relating to Mr. Jaleel

19   and the bombing.  We do not have that, which sort of speaks

20   to Mr. Ransom's point that the government should be

21   compelled to obtain.

22        We are attempting to obtain that material.  We

23   simply don't have it.  So I think those police reports that

24   are alluded to in the PowerPoint are indeed documentation in

25   possession of the Pakistani authorities that we would like

1    to have, too.

2              But this is underscored by the fact that the FBI

3    was not part of the team investigating this, and the

4    Pakistani government is not part of the investigative or

5    prosecution team.  And that's why we don't have this

6    information.

7              THE COURT:  Let's turn to 29 and 31, the

8    co-conspirator statements.

9              MR. KNIGHT:  Certainly, Your Honor.

10             THE COURT:  Is it correct that your current

11   position is that at some time around the production of

12   witness statements, that's when you intend to identify the

13   co-conspirator statements you're relying on, who made them

14   and what they are?

15             MR. KNIGHT:  No, because that frankly sounds more

16   cagey than it is.  I mean, our theory of the case and the

17   statements upon which we're going to rely at trial are

18   pretty well set out in the search warrant affidavit.  We

19   have not walked through the evidence and what rules of

20   evidence will be relied upon to offer those statements, but

21   it's not as if there is some great unknown hiding in the

22   discovery that we have withheld from prior factual

23   recitations about this case.

24             I mean, I think it is fair to say that Mr. Jaleel

25   was a known deceased unindicted co-conspirator, and there

are many unknown in this case, given the way it unfolded, the information we have and the description of the act itself.  So --

THE COURT:  You're offering co-conspirator statements.  I mean, you say "many unknown," meaning that it may be possible that you'll try to offer co-conspirator statements from unknown people?

MR. KNIGHT:  No.  I'm saying that there are many co-conspirators who as individuals are unknown, but to the extent we're offering co-conspirator statements, they are from individuals who are pretty well identified in the principal part of the discovery.  I mean, Mr. Jaleel, chief among them, again, is deceased and unindicted, obviously, but he would be an individual --

THE COURT:  We all, I think, understand that some day you'll want to offer statements by Mr. Jaleel, and then -- so at some point also you'll need, in order for us to litigate the 801 issue, you'll need to identify which statements you're going to put on at trial.  It's one thing to give them in discovery and another to put them on at trial and who made them.

And when will that happen?

MR. KNIGHT:  As we stated in here, I think our expectation is in our trial memorandum when the parties typically identify evidentiary issues for the Court, we'll

set forth our full theory of the case as we expect it to

unfold at trial, and we'll identify which statements of

Mr. Jaleel or perhaps Mr. Jaleel's wife we would offer at

trial as co-conspirator statements, and ask the Court for a

ruling and explain our reasons for offering them.

THE COURT:  Remind me how far in advance of trial

the pretrial conference is.

MR. KNIGHT:  I believe it's February 9th.  It's

roughly two months is my memory.

THE COURT:  Ms. Stephens, can you help us with

that?

MR. GORDER:  Your Honor, the trial memos are due

February 9th.  The pretrial conference is March 20th.

THE COURT:  The trial is what day again?

MR. GORDER:  April 13th.

THE COURT:  All right.  Thank you.

Mr. Ransom, do you wish to be heard by way of

reply to that?

MR. RANSOM:  Just a couple things, Your Honor.  We

all talk about Ali Jaleel as if he were dead.  There is no

evidence that he is dead.

We tried to get emails from the providers

ourselves, as the Court may know, because --

THE COURT:  Let's just pause there for a moment,

then.  So in -- that's relevant for a variety of reasons,

but if we're talking about co-conspirator statements, then

there's, I suppose, an issue of availability and

unavailability, and that just works to your advantage if

it's ever on the government's side of the ledger to prove

unavailability, right?

        MR. RANSOM:  Indeed.

        THE COURT:  All right.  Thank you.  Go ahead.

        MR. RANSOM:  And, Your Honor, here the government

has conceded there's no direct evidence that Mr. Khan

knowingly knew -- is that the proper way to say it?  That

Mr. Khan knew that there would be a suicide bomber.  So

that's why this information becomes so important.

        THE COURT:  Which information?  That Mr. Jaleel is

dead at the scene?

        MR. RANSOM:  Yes.  The bombing itself and what

took place.

        THE COURT:  I guess I have to say I'm about as

certain as I am of anything that the government has not yet

conceded that fact.  I don't know why you think the

government has conceded that he didn't know there would be a

suicide bombing.

        MR. RANSOM:  That's what they said.

        THE COURT:  How?  What words were said that --

        MR. RANSOM:  They said verbally to me and to

Ms. Matthews.

```
 1           THE COURT:  All right.  In any event, even if
 2   that's not true, it's still highly relevant evidence, isn't
 3   it, for you?  You don't need that to make this a centerpiece
 4   fact of your defense.
 5           MR. RANSOM:  That's right.
 6           THE COURT:  Mr. Jaleel's death or not at the
 7   scene.
 8           MR. RANSOM:  Well, yes, we do because that is the
 9   bombing alleged in the indictment, the suicide bombing.
10           THE COURT:  Right.  But I mean even if the
11   government's theory is he did know there would be a suicide
12   bombing, if Mr. Jaleel wasn't the suicide bomber, that goes
13   a long way towards helping your case, doesn't it?
14           MR. RANSOM:  That's true.  That's what we want to
15   know, Your Honor.  Thank you.
16           THE COURT:  All right.
17           All right.  Thank you all.  I'm going to think
18   about this a bit here, and I'll get back to you with an
19   answer within a few days.  I don't believe at this point I'm
20   going to require any further briefing of any kind.
21           I will -- I am going to ask the United States to
22   think a little more thoroughly about this "at peace" issue,
23   what's your position on it and what you're going to do.  So
24   I don't require an answer right now, but I invite you within
25   a few days to just clarify by email to counsel and
```

1   Ms. Stephens whether you have further thoughts of what

2   you're going to do about the position you've staked out on

3   the "at peace" issue.  Fair enough?

4            MR. KNIGHT:  Your Honor, I typically can't modify

5   an indictment in a terrorism case without the approval of

6   about 20 to 30 people, so I didn't want to do that before

7   the Court.

8            THE COURT:  I understand.

9            All right.  Thank you all.  We'll be in recess.

10           MS. BAGGIO:  Your Honor?

11           THE COURT:  Yes.

12           MS. BAGGIO:  I wanted to bring up one more thing,

13   Your Honor.

14           THE COURT:  Absolutely.

15           MS. BAGGIO:  I had asked for permission to have a

16   one-week extension on the filing of round three motions that

17   took it from last Monday to this coming Monday.

18           THE COURT:  You want a little more time than that

19   in light of what we talked about today and no answer from

20   me?

21           MS. BAGGIO:  That's my concern, Your Honor.

22           THE COURT:  I think that will work.

23           MS. BAGGIO:  Okay.  So what would --

24           THE COURT:  Why don't we do this.  Why don't we

25   float it off the date I give you an answer.  When you get an

1  answer from me, how much time will you need at that point?

2          MS. BAGGIO:  Well, we -- would two weeks be fair,

3  Your Honor?

4          THE COURT:  Yes.

5          MS. BAGGIO:  Okay.  Thank you.

6          THE COURT:  So that will come due two weeks after

7  I issue my rulings on the two -- the two basic umbrella

8  motions that I have in front of me today.

9          Thank you all.  We'll be in recess.

10          THE CLERK:  This court is adjourned.

11          (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

--o0o--

         I certify, by signing below, that the foregoing is
a correct transcript of the record of proceedings in the
above-entitled cause.  A transcript without an original
signature or conformed signature is not certified.


*/s/Bonita J. Shumway*                    *10/17/2014*
_____            _____
BONITA J. SHUMWAY, CSR, RMR, CRR     DATE
Official Court Reporter